# Exhibit C

Page 1

```
               UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF LOUISIANA

LAWRENCE LEVY, CEDRIC       *
HAMMOND, BRADLEY            *
CASTO, individually         *
and on behalf of all        *
others similarly            *
situated,                   *
                            *
          Plaintiffs,       *
                            *
     v.                     *  NO. 16-cv-542-JWD-EWD
                            *
LOUISIANA DEPARTMENT        *
OF PUBLIC SAFETY AND        *
CORRECTIONS, JAMES          *
LEBLANC, SECRETARY OF       *
THE LOUISIANA               *
DEPARTMENT OF PUBLIC        *
SAFETY AND                  *
CORRECTIONS,                *

          Defendants.

*********************************************
```

   The deposition of SARAH BORDELON was taken in the offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, located at Chase North Tower, 450 Laurel Street, 20th Floor, Baton Rouge, Louisiana  70801, on the 6th day of April, 2017, commencing at 12:51 P.M. and ending at 4:15 P.M.

REPORTED BY:
    DENISE M. CENTANNI
    CERTIFIED COURT REPORTER
    REGISTERED PROFESSIONAL REPORTER   JOB NO: 121514

TSG Reporting - Worldwide    877-702-9580

1        A P P E A R A N C E S
2

   PROSKAUER ROSE
3  (BY:   MADELINE REA, ESQ.)
   650 Poydras Street
4  New Orleans, Louisiana  70130
5        ATTORNEYS FOR THE PLAINTIFFS
6

   ADVOCACY CENTER
7  (BY:   SUSAN MEYERS, ESQ.
            LAURA THORNTON, ESQ.)
8  8325 Oak Street
   New Orleans, Louisiana  70118
9        ATTORNEYS FOR THE ADVOCACY CENTER
10

11 LOUISIANA DEPARTMENT OF JUSTICE
   (BY:   PATRICIA WILTON, ESQ.)
12 ASSISTANT ATTORNEY GENERAL
   1885 North 3rd Street
13 Baton Rouge, Louisiana  70802
14       ATTORNEY FOR THE DEFENDANTS
15
16
17
18
19
20
21
22
23
24
25

1   A.   Peace Officer Safety Training.
2   Q.   Okay.
3   A.   Originally a 12-week academy.  And
4   then once a year, we do 40 hours of
5   in-service training, which includes firearms,
6   numerous on-line classes, Disabilities Act,
7   sexual harassment.  Let's see.  We got
8   defensive tactics.
9   Q.   Okay.
10  A.   Everything police related.
11  Q.   So in your current role right now,
12  you are a parole and probation officer --
13  A.   Yes.
14  Q.   -- for the department?
15  A.   Yes.
16  Q.   And I want to clarify.  When I say
17  "the department" or the "Department of
18  Corrections or the "DOC," I'm referring to
19  the Louisiana Department of Public Safety and
20  Corrections.
21  A.   Okay.
22  Q.   So how long have you worked at the
23  department?
24  A.   Twenty-four years.
25  Q.   And what job titles have you had

1   you've supervised complained about the
2   quality of the interpreter at intake?
3        A.   No.
4        Q.   Either verbally or through a formal
5   written grievance?
6        A.   No, not to my knowledge.
7        Q.   So in addition to intake, is part
8   of your duties as a parole and probation
9   officer to conduct office visits?
10       A.   Yes.
11       Q.   And these are visits that you
12  conduct at your office with the probation or
13  parolee, and they --
14       A.   Yes.
15       Q.   -- come to see you?
16       A.   Yes.
17       Q.   How frequently do these occur with
18  each individual?
19       A.   It's not a set -- depending on the
20  case.  Some of them don't come into the
21  office at all.  I mean, may not for months.
22  Some need to come in frequently.  They have
23  more special conditions.  Some of them may
24  come in the office once every six months.
25       Q.   Is that why you have those set

1    from the State is current.
2         And I ask them if they have any
3    other problems or changes they want to
4    discuss; and any referrals that have to be
5    made, such as substance abuse evaluation or
6    anything a court has ordered on something
7    specific.
8         Q.   And I said "offender" earlier.  And
9    I think you understood what I meant, but just
10   to be clear.  So offenders can include
11   inmates as well.  But when I used it here
12   with you, I'm referring to your probationers
13   and parolees.
14        A.   Okay.
15        Q.   So have you ever arrested or --
16   have you ever arrested an offender as a
17   result of something you learned or witnessed
18   at an office visit?
19        A.   Yes.
20        Q.   Is there any way you could give me
21   a ballpark as to how often that's happened or
22   the last time it's happened?
23        A.   Oh, God.  Probably two weeks ago.
24        Q.   What types of issues might come up
25   that would cause you to arrest the offender?

1    A.    We get phone calls that they're
2  doing something illegal or they have warrants
3  out for them.  We get notification with my
4  cases that they've moved without permission,
5  that they didn't attend their sex offender
6  treatment classes.  There -- test positive
7  for drugs continually.  And that's some of
8  the reasons.
9    Q.    Uh-huh.  And I said "arrested."
10 But the same thing would apply to there could
11 be other forms of discipline less severe than
12 arresting that might occur at an office visit
13 for something you witnessed or heard about?
14   A.    Yes.
15   Q.    So if the probationer is deaf or
16 hard of hearing, is there an interpreter at
17 these office visits?
18   A.    No.  No.
19   Q.    Is there ever an interpreter at the
20 office visits?
21   A.    If there's something in length that
22 they don't understand, we use interpreters
23 through DOC via teleconference.
24   Q.    Like VRI, Video Remote
25 Interpreting?

Page 41

1   connection --
2       A.   Oh, no.
3       Q.   -- or things like that.
4       A.   Okay.  No.
5       Q.   So field visits is another aspect
6   of your job duties; correct?
7       A.   Yes.
8       Q.   And when I say "field visits," I'm
9   referring to visits where you're actually
10  going to the offender's home or work possibly
11  to check on them.
12      A.   Yes.
13      Q.   Is there anywhere else that you
14  might visit them?
15      A.   Home, work, sex offender class,
16  or --
17      Q.   Do you actually go to the class
18  when they are supposed to be there?
19      A.   Sometimes.  Every -- every once in
20  a while.  And if I should see them on the
21  street riding around near their house or
22  something.  That's about it.
23      Q.   And these visits are always
24  unscheduled?
25      A.   Yes.

1  actually my other offenders.  So, I mean, I
2  may not be specifically asking -- I talk to
3  the other offenders but not specifically
4  asking them anything specific about my other
5  offenders.  I may be -- the only thing I may
6  ask them about them is, "Hey, did they go to
7  work today" or "Do you know where they're
8  at?"
9       Q.   And are there interpreters at these
10 field visits?
11      A.   Nope.
12      Q.   Ever?
13      A.   Nope.
14      Q.   Do you know why not?
15      A.   For the interpreter's safety.
16      Q.   Could you explain that a little
17 more?
18      A.   I don't -- such as -- well, they're
19 not announced anyway, so I don't even know
20 what -- like I'll get up tomorrow morning,
21 3:00, 4:00 in the morning.  And I will just
22 go out.
23           Now, I'll probably have it in my
24 mind who I'm going to go see.  But I may
25 decide:  Oh, I'm going to see that person or

1  that person.  So I wouldn't have an
2  interpreter riding around in the middle of
3  the hood in the middle of the night with me.
4  And for that matter, I wouldn't have anybody
5  riding with me that's not POST certified and
6  armed.
7      Q.   Have any of the deaf or
8  hearing-impaired offenders you supervise
9  complained about the lack of an interpreter
10 at field visits?
11     A.   Never until a couple of months ago.
12     Q.   Who complained?
13     A.   I don't know if -- I don't know if
14 it's a complaint.  I was asked to get them to
15 sign a form from the department stating
16 that -- what was the form -- that they were
17 okay with not having -- the form asked how
18 they would like to communicate with me at
19 home visits rather than having an
20 interpreter.
21          It could be through the VRI,
22 through writing, through signing.  And I
23 asked them -- I explained that to them and
24 asked them to sign it.  Cedric was okay and
25 suggested -- Cedric Hammond suggested that it

1  be done through the VRI.
2      Q.   VRI, Video Remote Interpreting?
3      A.   Yes.  But he didn't want to sign
4  the form.  And I told him that was okay.  And
5  I scheduled an office visit for him to come
6  in so I could explain it to him in further
7  detail.
8           Went to Lawrence.  Lawrence's
9  statement was, "I'm basic.  I don't
10 understand."  That was a quote, "I'm basic.
11 I don't understand."
12          And he didn't want to sign
13 anything.  So I set up the same time, an
14 appointment for him, and told both of them an
15 interpreter would be provided when they came
16 to the office and we would explain this
17 further.
18     Q.   Did that visit ever take place?
19     A.   No.
20     Q.   Do you know why?
21     A.   I was contacted by our legal
22 division that said that their attorney
23 requested they not -- we not have that
24 meeting.
25     Q.   I'm going to show you Plaintiffs'

1  if it says through family member.  I know
2  one's written notes.  I know there's
3  another -- there's another blank too.  I
4  don't know what it is.
5         MS. REA:
6              Ms. Patricia, do you know if
7  there's a more recent form that we haven't
8  been sent?
9         MS. WILTON:
10             I don't -- I will -- apparently, it
11 doesn't sound like a more recent form if
12 she's saying it --
13        THE WITNESS:
14             It looks updated, like it --
15        MS. WILTON:
16             Like the one she had is a
17 predecessor to this form or something.  But
18 I'll investigate what form she is talking
19 about.
20 BY MS. REA:
21     Q.  So you think this is an updated --
22 Exhibit 29 is updated or the one you've seen
23 before?
24     A.  Well, working there for 24 years,
25 this looks like the older font they used to

Page 50

1  use.
2      MS. WILTON:
3          Okay.  So the one you have, you
4  think is updated?
5      THE WITNESS:
6          I think mine is updated.
7      MS. WILTON:
8          I'll check into it.
9      THE WITNESS:
10         That's my opinion.
11     MS. WILTON:
12         No worries.  I'll check into it.
13 BY MS. REA:
14     Q.   When you said that someone asked
15 you to provide that, who asked you to provide
16 that or who asked you to ask Cedric and
17 Lawrence to sign that?
18     A.   We received an E-mail from our
19 district manager to explain to them and have
20 them sign them and bring them back to the
21 office, the signed forms.
22     Q.   Who is the district manager?
23     A.   Gerri, G-E-R-R-I, Garon, G-A-R-O-N.
24 It either came from her or it come from her
25 headquarters, but I think it funneled from

1   her.
2       Q.   Have you ever arrested or otherwise
3   disciplined a probationer or parolee as a
4   result of something you learned or witnessed
5   at a parole visit?
6       A.   Yes.
7       Q.   And what types of things might you?
8       A.   With my sex offender cases, if
9   there's a juvenile present and they are
10  ordered not to have any contact with any
11  minors; if there are drugs present.  These
12  are unscheduled arrests; right?
13      Q.   Uh-huh.
14      A.   Okay.
15      Q.   Just something where you might go
16  to a field visit, and you see something and
17  you weren't planning on arresting them for
18  something?
19      A.   It would be something to do with
20  children or a crime being committed.
21      Q.   How often would you say that
22  happens?
23      A.   On standard field visits?  Rarely.
24  Very rarely.
25      Q.   And, again, how often might you

1        Give me one second.  I'll be right
2   back.
3        MS. REA:
4             Off the record.
5             (OFF RECORD)
6             (RECESS)
7   BY MS. REA:
8        Q.   I want to clarify a couple of
9   things you said earlier.  You said that you
10  had heard a complaint that the interpreter at
11  the sex offender treatment classes that
12  Lawrence and Cedric attended were not good?
13       A.   I recall Mr. Anderson saying -- he
14  was present at a couple of the classes,
15  saying that they did not -- they had told him
16  they did not -- I don't know the exact words
17  that were used.  What I took out of it is
18  they weren't satisfied with those
19  interpreters.
20       Q.   You said those interpreters were
21  DOC interpreters?
22       A.   Yes.
23       Q.   When you say that, do you mean
24  inmate interpreter?
25       A.   Yes.  Me and my supervisor,

1  Q.   So it's not random?  There are
2  factors that go into it?
3  A.   Yes.
4  Q.   Okay.  So in these field visits
5  when you -- when there is no interpreter
6  present, which is always.  So when -- so at
7  these field visits, how can you be sure that
8  the offender understands what you're trying
9  to communicate to them?
10 A.   We write on a notepad.  And they
11 will write -- they write back.  Now,
12 sometimes they won't write if they give me a
13 yes or a no answer.  But if they look at me
14 kind of strange, I'll write it a different
15 way until --
16      And I've never had it where they
17 told me they didn't understand.  Because if
18 they would have, I would have told them to
19 come to the office and we'll discuss it
20 there, get an interpreter or what have you.
21      Well, that did happen with the
22 form.  That did happen with that form that I
23 tried to get them to sign.  That's when I
24 told them to come to the office.
25 Q.   If you became aware of a violation