# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

LAWRENCE LEVY, ET AL
    Plaintiffs

VERSUS                              CASE NO. 3:16-CV-00542-JWD-EWD

LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS,
ET AL.,
    Defendants

TESTIMONY OF
COREY BENNETT
taken on Wednesday, the 3rd day of May 2017, commencing at 1:01 p.m., before Rheba Eppinette Gwin, Certified Court Reporter in

and for the State of Louisiana, at Attorney

General of Louisiana Satellite Office, 130

Desiard Street, #812, Monroe, Louisiana 71201,

and concluding at 3:15 p.m.

COURT REPORTERS OF LOUISIANA, L.L.C.

9614 Brookline Avenue, Suite A

Baton Rouge, Louisiana  70809

PHONE (225) 201-9650 * FAX (225) 201-9651

E-Mail:  depos@courtreportersla.com

```
 1    APPEARANCES:

 2

 3    Representing the Plaintiffs LAWRENCE LEVY, ET AL:

 4         ADVOCACY CENTER
           8325 Oak Street
 5         New Orleans, Louisiana 70118
           (504) 522-2337
 6
               appearing herein by and through
 7             Ms. Susan Meyers
               smeyers@advocacyla.org
 8
           AND
 9
               Ms. Laura Lee Thornton
10             lthornton@advocactyla.org

11
      Representing the Defendants LOUISIANA DEPARTMENT
12    OF PUBLIC SAFETY AND CORRECTIONS, ET AL:

13         LOUISIANA DEPARTMENT OF JUSTICE
           1885 N. 3rd Street
14         Baton Rouge, Louisiana  70802

15             appearing herein by and through
               Ms. Patricia Wilton
16             wiltonp@ag.louisiana.gov
               wiltong@ag.state.la.us
17

18
      Reported by:
19
           Rheba Eppinette Gwin, Certified
20         Court Reporter No. 2010027 in and
           for the State of Louisiana
21

22

23

24

25
```

```
 1   A    1993.
 2   Q    Okay.  Do you have any -- excuse me -- any
 3        certifications related to your job?
 4   A    Um, not really.  I mean, I've had a lot of
 5        training but not as far as extra
 6        certifications, no.  I mean, I'm POST
 7        certified.
 8   Q    When did you receive the POST certification?
 9   A    1996.
10   Q    Okay.  How long have you -- Let me back up and
11        just to make sure that we're clear for the
12        record, if I refer to the Department or LDPSC,
13        which I seem to be having a difficult time
14        saying today, I am referring to the Louisiana
15        Department of Public Safety and Corrections.
16   A    Okay.
17   Q    So, how long have you worked at the
18        department?
19   A    Twenty-one (21) years.
20   Q    Okay.  And what job titles have you had, if
21        you can give me a rough overview, what job
22        titles have you had for the department?  What
23        did you start as?
24   A    Officer one.
25   Q    In the Division of Probation and Parole?
```

```
 1   A    Yes.
 2   Q    Okay.  And so that would have been back in
 3        96?
 4   A    96, yes, ma'am.
 5   Q    Okay.  And how long were you an officer one
 6        for?
 7   A    Um, I think back then I think it was about a
 8        year --
 9   Q    Okay.
10   A    -- before you went up to officer two.
11   Q    Okay.  And after officer one?
12   A    Officer two.
13   Q    Okay.  And how long did you hold that
14        position?
15   A    Until 2007.
16   Q    Okay.  And after that?
17   A    Sex offender specialist.
18   Q    What is a sex offender specialist?
19   A    I just supervised sex offenders.
20   Q    So, in your capacity as an officer with the
21        Division of Probation and Parole, you
22        supervised probationers and parolees, correct?
23   A    Correct, yes.
24   Q    And as a sex offender specialist, your roster
25        of supervisees or probationers and parolees
```

```
 1         that you supervised were solely sex offenders?
 2   A     Uh, at this time, yes.
 3   Q     At this current time or at --
 4   A     At the current time.
 5   Q     So, you were made a sex offender specialists
 6         in what year, I'm sorry?
 7   A     2007.
 8   Q     2007, okay.  And at that time, were you
 9         entirely working with sex offenders?
10   A     Also specialized violent offenders.
11   Q     Okay.  Did you receive additional training to
12         get those specialties?
13   A     Really just I was trained by other sex
14         offender officers, and I go -- we go to sex
15         offender training.  We used to go about twice
16         a year.  Due to budget cuts, we've kind of cut
17         back on that, but we still have training about
18         once a year.
19   Q     Okay.  And following that, any additional
20         titles or roles with the department?
21   A     No, ma'am.
22   Q     Okay.  So, you are currently a sex offender
23         specialist?
24   A     Yes.
25   Q     And have been since 2007?
```

```
 1        go back to the parole board?
 2   A    No, not necessarily.  Usually I would say no.
 3   Q    Okay.  What happens?
 4   A    We just send documentation to the court and
 5        ask the judge to have a condition added.  He
 6        sends back a copy of a motion or whatever
 7        adding the condition. The parole board -- send
 8        an activity report to the parole board adding
 9        a condition and they send back a signed copy
10        of the condition being added to the parole
11        conditions.
12   Q    Okay.  And then is that, I believe you
13        referred earlier to providing the
14        documentation to the offender, that's --
15   A    Correct.
16   Q    -- the documentation you would provide?
17   A    Correct, yes.
18   Q    Okay.  Is it important that someone understand
19        the conditions of their probation or parole?
20   A    Yes, ma'am.
21   Q    Violating probation or parole can result in
22        arrest, correct?
23   A    Correct.
24   Q    Or revocation of the probation --
25   A    Right.
```

```
 1   Q    -- or parole?
 2   A    Yes.
 3   Q    Okay.  And do you also -- do you also record a
 4        case narrative for inclusion in a file on
 5        offenders you supervise?
 6   A    Yes, ma'am.
 7   Q    And that's one of your job responsibilities?
 8   A    Correct.  Yes.
 9   Q    Okay.  I believe you said earlier that you
10        report to Bradley Nolan?
11   A    Yes, that's my direct supervisor.
12   Q    Okay.  And what is Mr. Nolan's title please?
13   A    Supervisor.
14   Q    Okay.  Do you work out of a district office?
15   A    Yes, Monroe District.
16   Q    Okay, so is Mr. Nolan the supervisor of the
17        Monroe District office?
18   A    He's one of the supervisors.
19   Q    How many are there?
20   A    Six.
21   Q    Okay.  And do you know whom Mr. Nolan reports
22        to?
23   A    Deborah Bradford.
24   Q    Do you know Ms. Bradford's title?
25   A    District Administrator.
```

```
 1         disciplined a probationer or parolee as a
 2         result of something you learned or witnessed
 3         during an office visit?
 4   A     Yes, I'm sure I have.
 5   Q     Do you recall what the circumstances were?
 6   A     Honestly, I don't.  I mean, I know I've done
 7         it, but -- maybe if they've had multiple drug
 8         screens, moved without notification and failed
 9         to register, if they have new arrests.
10   Q     Okay.  Have you ever added conditions to
11         probation or parole during an office visit?
12   A     No.  I mean, I've made referrals.
13   Q     What about the circumstance where, you know,
14         you're imposing a curfew or something like
15         that?  Would that happen during an office
16         visit?
17   A     I mean, if the paperwork came in and I haven't
18         served them with it yet, yes, I would do that.
19   Q     Okay.  When else would you be giving them that
20         paperwork?
21   A     Possibly when I saw them in the field.
22   Q     Okay.  And so you've had office visits with
23         Bradley Casto --
24   A     Yes.
25   Q     -- as part of his supervision?  Is there an
```

```
 1          interpreter at his office visits?
 2   A      No.
 3   Q      Okay.
 4   A      The very first time he came to my office, he
 5          had an interpreter with him.
 6   Q      And was that -- Was it a live interpreter?
 7   A      Yes.
 8   Q      A person in person?  And did the department
 9          provide that interpreter?
10   A      No, I have no idea who the guy was.  I think
11          it was just a friend.
12   Q      Why haven't there been interpreters at other
13          office visits with Mr. Casto?
14   A      I haven't needed them.
15   Q      Why not?
16   A      Me and Mr. Casto communicate fine.  We have no
17          problem communicating.
18   Q      How do you communicate?
19   A      Just talk.
20   Q      And he can understand you?
21   A      Yes, ma'am.
22   Q      And you can understand him?
23   A      Yes, ma'am.
24   Q      And has he ever requested an interpreter?
25   A      He brought it up the first time he came in,
```

```
 1   Q    Okay.  And his wife is named Jenny, is that
 2        correct?
 3   A    Yes.
 4   Q    Okay.  Has Jenny Casto ever discussed the
 5        issue of interpreters with you?
 6   A    She did the first time, the first time he came
 7        in.
 8   Q    Okay.
 9   A    Yes, ma'am.
10   Q    Okay.  And just to be clear, that first time
11        was not the intake interview, correct?
12   A    No.
13   Q    Okay.  All right.  And so, you all decided
14        that you didn't need an interpreter that day.
15        Did you ever reach a conclusion on whether
16        interpreters were available from your
17        supervisor or your district administrator?
18   A    I believe we do have an interpreter available
19        through Angola for office visits and I believe
20        for preliminary hearings.
21   Q    And have you ever used one of those inmates at
22        Angola?
23   A    No.
24   Q    Either for Mr. Casto or for anyone else?
25   A    No.
```

```
 1            Yes.
 2     Q      Have you ever arrested someone as a result of
 3            something that you learned or witnessed at a
 4            field visit?
 5     A      Yes.
 6     Q      What were those circumstances?
 7     A      The only thing I can think of, drugs.
 8     Q      So, you saw actual drugs --
 9     A      Right.
10     Q      -- or drug paraphernalia?
11     A      Correct.
12     Q      Okay.  Have you ever done any -- imposed any
13            other kind of discipline or imposed new
14            conditions on the probation or parole as a
15            result of something you learned or witnessed
16            at a field visit?
17     A      Um, I mean, we don't just revoke people.  We
18            do give jail sanctions, thirty to ninety day
19            jail sanctions.
20     Q      What does that mean?
21     A      They just go to jail for like thirty to ninety
22            days.
23     Q      Okay.
24     A      They also do have some sanctions, I don't
25            really do them with sex offenders, that you
```