# Exhibit F

Page 1

1                UNITED STATES DISTRICT COURT
2                MIDDLE DISTRICT OF LOUISIANA
3
4   LAWRENCE LEVY, CEDRIC              :
    HAMMOND, BRADLEY CASTO,            :
5   INDIVIDUALLY AND ON BEHALF OF      :
    ALL OTHERS SIMILARLY SITUATED      :
6                                      :
    VERSUS                             :
7                                      : NO. 16-cv-542-JWD-EWD
    LOUISIANA DEPARTMENT OF            :
8   PUBLIC SAFETY AND                  :
    CORRECTIONS, JAMES LEBLANC,        :
9   SECRETARY OF THE LOUISIANA         :
    DEPARTMENT OF PUBLIC SAFETY        :
10  AND CORRECTIONS                    :
11  * * * * * * * * * * * * * * * * * * * * * * * *
12
13            TRANSCRIPT OF THE DEPOSITION OF
14                  DANIEL D. BURCH, PH.D.
15  TAKEN ON BEHALF OF PLAINTIFFS, REPORTED IN THE ABOVE
16  ENTITLED AND NUMBERED CAUSE BY ESTELLA O. CHAMPION,
17  CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.
18  * * * * * * * * * * * * * * * * * * * * * * * *
19
20  REPORTED AT THE OFFICES OF:
21      BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
22      450 LAUREL STREET
23      BATON ROUGE, LOUISIANA 70801
24         COMMENCING AT 9:40 A.M. ON APRIL 5, 2017.
25  Job no. 121512

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFFS LAWRENCE LEVY, CEDRIC HAMMOND,

 4   BRADLEY CASTO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS

 5   SIMILARLY SITUATED:

 6        PROSKAUER ROSE

 7        BY:  MADELINE REA, ESQUIRE

 8        650 POYDRAS STREET

 9        NEW ORLEANS, LOUISIANA 70130

10            - AND -

11        ADVOCACY CENTER OF LOUISIANA

12        LAURA THORNTON, ESQUIRE

13        SUSAN MEYERS, ESQUIRE

14        8325 OAK STREET

15        NEW ORLEANS, LOUISIANA 70118

16

17

18

19

20

21

22

23

24

25
```

Page 3

1         APPEARANCES (CONTINUED)

2

3  FOR THE DEFENDANTS LOUISIANA DEPARTMENT OF PUBLIC

4  SAFETY AND CORRECTIONS, JAMES LEBLANC, SECRETARY OF THE

5  LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS:

6        OFFICE OF THE ATTORNEY GENERAL

7        LOUISIANA DEPARTMENT OF JUSTICE

8        BY:   PATRICIA WILTON, ASSISTANT ATTORNEY GENERAL

9        1885 NORTH THIRD STREET

10       BATON ROUGE, LOUISIANA 70802

11            AND

12       DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

13       BY:   SUSAN GRIFFIN, ESQUIRE

14       504 MAYFLOWER STREET

15       BATON ROUGE, LOUISIANA 70802

16

17

18  REPORTED BY:

19       ESTELLA CHAMPION, RDR, CRR

20       CERTIFIED REALTIME REPORTER

21       CERTIFICATE NUMBER 76003 (in good standing)

22       REGISTERED DIPLOMATE REPORTER

23                  * * *

24

25

1    Q.   Moving on to the next exhibit, 54.
2              (Exhibit 54 marked for identification.)
3    A.   I recognize that.
4    Q.   So you've had a chance to review.  I just
5  wanted you to identify the document.
6    A.   Yes, it's my curriculum vita.
7    Q.   And this is the curriculum vitae you provided
8  the Plaintiffs earlier this month?
9    A.   Uh-huh.  Yes.
10   Q.   All right.  Do you have any reason to doubt
11 the authenticity of it?  Or that is what you're saying
12 that it is?
13   A.   Yes, that -- yes.
14   Q.   Okay.  For the sake of this deposition, when
15 I say "SLSI," you understand that I'm referring to Sign
16 Language Services International?
17   A.   Yes.
18   Q.   Okay.  So when was SLSI founded?
19   A.   Officially with the Secretary of State in
20 1995.  But we've been operating as an agency for many
21 years, or an independent -- I've been interpreting for
22 many years.
23   Q.   And on Exhibit 54, it says, on April 1, 1972
24 to the present, vice president of SLSI.  Does that
25 sound right?

1    A.   What page are you on?
2         Oh, I haven't numbered the pages.  Good.
3    Great.
4         Okay.  Yes.
5         Well, as I said, I've been operating as a
6    sign language interpreter for many, many, many years,
7    and '95 we formally incorporated.
8    Q.   Was that -- was the company around before
9    then or ...
10   A.   Not with that name, no.  We just really
11   didn't have a name.  But we went official in '95.  But
12   that's what I've been doing since '72.
13   Q.   Okay.  And who founded the company?
14   A.   My wife and I.
15   Q.   Priscilla Burch?
16   A.   Yes.
17   Q.   And what does SLSI do?
18   A.   Provide sign language interpreting services.
19   Q.   Does that include classes?
20   A.   It includes the entire spectrum of services:
21   Medical, legal, religious, cultural arts, governmental
22   services, meetings, funerals, press conferences.  You
23   name it.
24   Q.   Okay.  And you're the vice president?
25   A.   Yes.

1  Q.   And you've been vice president since it was
2  founded?
3  A.   Yes.
4  Q.   Have you had any other roles at the company?
5  A.   No.
6  Q.   Who is the president?
7  A.   Priscilla.
8  Q.   Priscilla, your wife, is president of SLSI?
9  A.   Yes.
10 Q.   And she's always been the president?
11 A.   Yes.
12 Q.   So you-all started the company together?
13 A.   Yes.
14 Q.   Do you know of an organization called the
15 National Professional Organization of Interpreters?
16 A.   National Professional Organization?  There is
17 no such organization.
18 Q.   Okay.
19 A.   Where are you looking -- where did you see
20 that?
21 Q.   I heard someone mention that name, but I ...
22 A.   It's the Registry of Interpreters for the
23 Deaf is the name of the professional organization.
24 Q.   Yes.  Just didn't know if this was a separate
25 one.

1           Have you ever been investigated by any
2    professional organization?
3        A.   No.
4        Q.   Has SLSI ever been investigated by any
5    professional organization?
6        A.   No.
7        Q.   Do you or does SLSI provide any services to
8    the Department?
9        A.   Yes, we have.
10       Q.   What type of services?  What type of services
11   do you provide to the Department?
12       A.   I thought you said "in-service" training.
13   Did you not say that?
14       Q.   I asked if you or SLSI provide any services
15   to the Department.
16       A.   Oh, any service.  I'm sorry.  I thought you
17   said in-service.
18           We've done a couple of in-service training
19   for the Department, for their staff.  But other than
20   that, the contract, the instructional contract; and
21   then we had a contract with the state penitentiary in
22   Angola for sign language interpreting services.
23       Q.   And just to clarify again, I think I
24   mentioned it earlier, but when I say "the Department,"
25   I'm referring to the Louisiana Department of Public

Page 22

1  Safety and Corrections.  I might also call them "the
2  Department of Corrections," or "the DOC."
3      A.   Right.  But they also have, I believe,
4  Probation and Parole underneath them, or within the
5  Department, and then also each institution.  So that's
6  why I said what I said.
7      Q.   Thank you.
8           How long have you or SLSI worked with the
9  Department?
10     A.   With the Department?  I want to say we
11 started working with the Department in 2004.  I want to
12 say that.
13     Q.   And there's no difference between you and
14 SLSI for the purpose of that answer?
15     A.   No.
16     Q.   So how did you start working with the
17 Department?
18     A.   The, the Department contacted me.
19          At the time it was Warden Peabody and --
20 gosh -- and I want to say Warden Miller.
21          I could be wrong on that one.  But it was
22 another warden, a female warden, came to my house,
23 which is our place of business, and asked if we would
24 be interested in working with the Department to address
25 accessibility concerns and whatever that would entail.

1  states now as the standard.  But I wanted something a
2  little more generic than -- it's pretty focused on
3  education.  And a lot of people that are coming out of
4  the prisons, I found out since, are banned from working
5  in the public schools at all.  There's like a huge list
6  of:  If you're convicted of breathing oxygen, you can't
7  work in the public schools.
8          So that's why I'm hoping to switch that test.
9  But that's really the true benchmark of the program is
10 that outside test.  And that test is valid -- valid,
11 reliable, fair and legally defensible.
12      Q.   So just so to make sure I understand, the
13 EIPA is the test.
14      A.   Uh-huh.
15      Q.   You get a score on the EIPA.
16      A.   Yes.
17      Q.   For purposes of being a DOC-certified
18 interpreter, you need a 3.0 out of 5 on the test?
19      A.   3.0, right.  And pass the written test.
20      Q.   And pass the written test.
21      A.   Yeah.
22      Q.   But to be certified by the Registry of
23 Interpreters for the Deaf, you need a 4.0 out of 5?
24      A.   No.  The wording is incorrect.
25          To be recognized by RID -- not to be

1  certified by it, but to be recognized by RID, you need
2  a 4.0.
3      Q.   And what is the significance of being
4  recognized by RID?
5      A.   It's -- RID recognizes the certificates --
6  I'm a little soured on my own professional association
7  right now.  We're going through some changes.
8           But it's that the association goes like,
9  okay:  We think this test shows that you would be
10 qualified in an educational setting.  Although we
11 didn't certify you, we'll take your 4.0 and say, yeah,
12 okay, you're cool.
13     Q.   You're certified by the EIPA but -- and the
14 RID recognizes it?
15     A.   But you're not certified -- again
16 terminology.  EIPA only assesses you.  It doesn't
17 certify you.
18          So if you take that assessment and you -- I
19 know it's all, it's all -- everybody field has its own
20 little terminology.
21          If you take that assessment and get a 4.0 or
22 above, then RID will recognize the fact that you have
23 some skill and then allows you to pay certified dues to
24 the national association, to RID.  So it's like you're
25 quasi-certified in their eyes, in RID's eyes.

1   want to bring out, is in the process of this, we have
2   discovered parents of deaf children, cousins, aunts,
3   uncles, grandparents, some spouses who have deafness in
4   their family and individuals who are going deaf.  So
5   it's been much more effective than just with the
6   offenders that we've been directly working with, but
7   it's also expanded access services for quite a number
8   of other people.
9        Q.   I have a question about family members.
10       A.   Uh-huh.
11       Q.   What do you think about using family members
12  as interpreters?
13       A.   I don't like it.
14       Q.   Any specific reasons why?
15       A.   Objectivity, and the fact that most family
16  members -- you know, there are some exceptions -- are
17  not certified as interpreters, don't have the language.
18            They have at home, we can talk at home.  But
19  any technical information or legal information, medical
20  information, most family members do not have the sign
21  vocabulary, and many don't have the English vocabulary,
22  to take rather complicated concepts and interpret them
23  for their family member.
24            Plus just the sheer objectivity of it.  You
25  know, if you're interpreting for a family member that

1  has cancer and the prognosis is three months, you
2  probably are not going to want to tell that, so ...
3              MS. REA:  Okay.  Actually can we take a quick
4          break?  Ten minutes?
5              MS. WILTON:  Sure.
6                  (Brief recess taken.)
7  BY MS. REA:
8      Q.   We can go back on.
9           Do you have, or does SLSI have minimum
10 standards for their employees or their contractors who
11 interpret?
12     A.   For contractors we require certification.
13     Q.   Can you explain, the certification by whom?
14     A.   Certification.
15          If you can present to me a document or a
16 certificate from a psychometrically sound interpreting
17 test, then we'll accept that.
18          Generally speaking it's RID.  We also have
19 EIPA people.  And I do know that there are other states
20 that have their own tests; that presented with those
21 documents, we'll contract with you.
22     Q.   And for EIPA, is it a certain score they have
23 to obtain?
24     A.   3.0.  But there are very few of those around.
25     Q.   Typically they have higher scores?