# Exhibit J

## EXPERT REPORT OF DENNIS COKELY, Ph.D.

### I.      EXPERT QUALIFICATIONS

I am currently a tenured Professor of American Sign Language ("ASL") and Modern Languages at Northeastern University. I am the Director of the American Sign Language Program, former Director of the World Languages Center and the former Chair of the Department of Languages, Literatures and Cultures. I have been involved with Deaf people on a personal and professional level for 49 years. I hold a Masters in Applied Linguistics from American University and a Doctorate in Sociolinguistics from Georgetown University. I am a nationally certified Sign Language interpreter and have served two terms as President of the Registry of Interpreters for the Deaf ("RID"), the professional organization of and the national certifying body for interpreters. I have authored or coauthored 10 textbooks, five book chapters, and 35 articles or conference proceedings, and have directed and/or edited over 350 videotapes focusing on American Sign Language and ASL/English Interpretation. I also have produced published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is still widely used in Sign Language programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process*, is widely used in Interpreter Education Programs and has been translated into Italian and German and significant portions have been translated into Swedish and Japanese. I am currently the Principal Investigator for a $2 million grant from the U.S. Department of Education to establish a Center for Atypical Language Interpreting at Northeastern University.

Prior to coming to Northeastern, I spent 12 years working full-time as the President and co-owner of Sign Media, Inc., a video-production company specializing in producing print and video material focused on the American Deaf Community ("Deaf Community" or

"Community"), American Sign Language, and ASL/English Interpretation. Prior to that, I spent 13 years working at Gallaudet University[1] in a number of capacities: a teacher of elementary, undergraduate and graduate students; an administrator responsible for teaching and evaluating faculty and staff; and a Research Associate in the Linguistics Research Lab researching ASL/English interpretation. Attached as Exhibit A is my complete curriculum vitae, which also includes a listing of the other instances in which I have served as an expert witness. During the last four-years I have not testified at trial and was deposed once on December 9, 2016 in *McBride, et al vs. the Michigan Department of Corrections*, Case No. C.A. 2:15-CV-11222, E.D. Mich.

I have been retained by Proskauer Rose LLP to work on this case at the rate of $150.00 per hour. In addition to being based on my knowledge and experience, my report is based on: (1) a review of materials provided to me by counsel and identified in Exhibit B; and (2) individual video meetings with Plaintiffs Lawrence Levy, Bradley Casto and Cedric Hammond.

## II.    EXECUTIVE SUMMARY

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. The vast majority of people who are not deaf have stereotypic misconceptions about d/Deaf [2] people and American Sign Language. They often

---

[1] Gallaudet University is a federally chartered private university for the education of d/Deaf and hard of hearing people located in Washington, D.C.

[2] The significance of the distinction between lower case and upper case D in the word d/Deaf is explained below.

believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication when, in reality, the level of lip-reading accuracy for most d/Deaf and hard of hearing people is 30% at best. Those who are not deaf often believe that d/Deaf people can read and write in fluent English when, in reality, the average Deaf person reads at approximately a fourth-grade reading level. Thus, the assumption that written communication is an effective means of communication with all d/Deaf people is erroneous. Those who are not d/Deaf often fail to understand that effective communication with d/Deaf people requires that one communicate visually, such as by using visual signals and alarms and provision of sign language interpreters when needed. These erroneous, stereotypic beliefs about and attitudes toward d/Deaf people frequently result in systematic discrimination against d/Deaf people. Such discrimination, known as audism, occurs when those who are not d/Deaf assume that d/Deaf people are inferior because of their different hearing status and when access to environments, technology, institutions and programs is predicated upon one's ability to hear. Simply put, the failure to provide visual access to aspects of society that are only auditorily accessible is audism.

Based on my experience of over 49 years, my video meetings with plaintiffs, and my review of written documentation, I believe that d/Deaf and hard of hearing LDPSC (Louisiana Department of Public Safety and Corrections) probationers and parolees have been denied effective communication. I believe that LDPSC has restricted access to services, programs and communication in a way that denies meaningful and effective communicative access for LDPSC d/Deaf and hard of hearing probationers and parolees. I further believe that the policies and procedures put in place unfairly and unnecessarily treat d/Deaf and hard of hearing LDPSC probationers and parolees differently than non-deaf probationers and parolees and deny them access to services, programs and benefits that are afforded to non-deaf probationers and parolees.

3

In sum, I believe that LDPSC engages in audist behaviors.

To ensure effective communication for d/Deaf and hard of hearing probationers and parolees, LDPSC must, minimally, undertake the following major steps.

A.     In order to enable d/Deaf and hard of hearing probationers and parolees to communicate effectively with probation and parole officers, LDPSC must reliably provide qualified sign language interpreters for all interactions between d/Deaf and hard of hearing probationers and parolees and probation and parole officers, including office and home visits.

B.     In order to enable d/Deaf and hard of hearing probationers and parolees to communicate effectively in LDPSC mandatory counseling, therapy or self-help programs, LDPSC must reliably provide qualified sign language interpreters for all interactions between d/Deaf and hard of hearing probationers and parolees and counselors and teachers.

C.     LDPSC must review and revise, where appropriate, all of its policies and procedures to ensure that d/Deaf and hard of hearing probationers and parolees are not systematically disadvantaged relative to probationers and parolees who are not d/Deaf or hard of hearing.

D.     LDPSC must provide education and training programs for all probation and parole officers and LSPSC personnel who interact with d/Deaf and hard of hearing probationers and parolees. Further, these programs must be repeated at regularly scheduled intervals.

E.     LDPSC must identify an independent monitor (entity or individual) that can ensure that LDPSC is reliably providing effective communicative access to all

4

mandatory LDPSC post-release activities.

Finally, if additional information becomes available, I reserve the right to examine that material and expand upon the opinions offered in this report.

## III.  ANALYSIS

### A.    *Defining Deafness*

Although it is often the case that those seeking to define or discuss deafness do so from a medical or audiological perspective, such a singular perspective significantly misses the mark. As Dr. Jerome] Schein explained, the meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf peoples' daily lives, how the disability of deafness becomes a handicap." (Schein, 1996).[3]  Schein goes on to define deafness as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone." The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot hear *and* cannot understand speech; they may be able to hear speech but cannot understand it (i.e. cannot discriminate what is said). Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear. This functional definition then clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear *and* cannot

---

[3] All secondary sources referenced in my report are listed in their entirety in the "References" section of my report.

5

understand speech).

The age at which one becomes deaf is critically important because it determines membership in one of two subsets within the larger class of deaf individuals. Childhood deafness creates significant obstacles to acquiring spoken language and becoming literate in English, and is generally associated with a tendency to seek out and socialize with other deaf people, thus becoming part of the American Deaf Community. Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (i.e. those early deafened) for companionship, nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because, although members of each subset are deaf (i.e. they cannot hear *and* cannot understand speech), and although members of each subset rely upon visual not auditory means of communication, their life experiences have had different trajectories.

### Summary Of Opinions With Respect To Defining Deafness:

- The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.

- The class of people who are deaf cannot hear and cannot understand speech.

- Within the class of people who are deaf, there are two subsets: those who are deaf from childhood and those who become late-deafened.

- Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

B.     *The American Deaf Community: A Linguistic And Cultural Minority*

There is an identifiable subset of deaf people in America that is unable to rely upon hearing and speech as an effective and primary means of relating to the world and interacting

with those who are not deaf. As children, some of these individuals, by virtue of parental decision or educational placement, are placed on a trajectory where they will spend their lives pursuing the goal of assimilating with the hearing and speaking majority of the population (i.e. trying to "pass") to the extent possible. Others, however, are placed on a very different trajectory because they have been given or choose to embrace a different "center" for their lives – a Deaf center. These deaf individuals see themselves as Deaf. The written distinction between "deaf" and "Deaf," lower and upper case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority (Woodward, 1972).

Individuals who are Deaf use American Sign Language and are fundamentally a visual people, with their own visual language, social organizations, history, and mores. They see themselves as members of the Deaf-World. Indeed, a case has been made that members of the Deaf-World should be viewed as an ethnic group rather than a "disabled" group (Lane, Pillard & Hedberg, 2011). Contrary to the view held by most non-deaf people, Deaf people do not view their audiological condition as the primary reality that binds them together as a Community. Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of American Sign Language. Deaf people are a linguistic and cultural minority that has been, and continues to be, communicatively disadvantaged by the hearing and speaking majority (e.g. Padden and Humphries 2005; Lane 1992; Jankowski, 1997; Wrigley, 1996). In short, these individuals, united by their use of American Sign Language, are members of the American Deaf Community.

The use of American Sign Language not only unites Deaf people but it also defines them as a linguistic minority. The primary reason for the central role of American Sign Language is

that, unlike any other means of communication available to Deaf people, American Sign Language is the only means of communication that enables effective, efficient and reliable communication.

While some late-deafened adults do try to learn to sign, they often do so to compensate for the deteriorating intelligibility of their speech, to communicate with family members or friends who are learning to sign or perhaps to communicate with Deaf people they have met. However, learning to sign does not automatically mean that they wish to identify themselves as Deaf; late-deafened adults usually continue to identify themselves as deaf – unable to hear, sharing an audiological condition and the need for visual means of communication with Deaf people – but they do not see themselves as having a linguistic and cultural identity as a member of the Deaf Community.

**<u>Summary Of Opinions With Respect To The American Deaf Community:</u>**

- Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the majority.

- Members of the American Deaf Community have their own visual language: American Sign Language.

- Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.

- American Sign Language is central to determining membership in and defining the American Deaf Community.

- American Sign Language is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

C.    *Deaf People As A Linguistic Community*

8

Although the existence of an American Deaf Community is now undeniable, most people with little or no knowledge of or experience with d/Deaf people make a number of stereotypic and unfounded assumptions about d/Deaf people (Cokely, 2001; Spingarn, 2001). For example, they wrongly assume that "all deaf people can lip-read" or that "all deaf people can speak" or that "all deaf people are fully literate in English." While these are uninformed and naïve views of d/Deaf people, the long-standing and well-documented reality is that members of the American Deaf Community, as a group, do not use their speech for communication, do not lip-read English well and, as a group, have extremely limited competence in English.

As noted above, the most significant factor uniting and identifying members of the American Deaf Community is not whether a Deaf person uses speech, the degree of hearing possessed by a Deaf person, or competence in English. Rather, it is whether a person uses American Sign Language as his/her primary means of communication. The use of American Sign Language provides a means of determining acceptance into the Community, enables social interaction among members of the Community, and, through the use of ASL/English interpreters, provides a ready means of interacting with non-deaf people. The importance of American Sign Language derives from the fact that it is a visually clear and accessible means of communication that enables Deaf people to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of American Sign Language in defining the American Deaf Community as a linguistic minority, it is important to address and dispel several misconceptions about ASL.

     *1.*    ***American Sign Language***

A primary misconception often held by those unfamiliar with American Sign Language is

9

that they assume it is simply a manual form of, or a derivative form of, spoken English. They assume wrongly. The lexicon (i.e. the vocabulary) of a signed language refers, not to the words of a spoken language, but rather directly to the concept or meaning that Deaf people wish to convey (Baker-Shenk & Cokely, 1980; Valli, Lucas & Mulrooney, 2005). In American Sign Language, signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. For example, the American Sign Language sign refers to an object (e.g. a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). American Sign Language has a lexicon and syntactic structure quite unlike that of spoken English. In simplest terms, there is not a one-to-one correspondence between American English words and the signs in American Sign Language, as is true of any two languages, spoken or signed. Instead, American Sign Language is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned or acquired it. The linguistic evidence is clear and incontrovertible - American Sign Language is structurally different from English. (Stokoe, 1965)

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, i.e. an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is Stokoe notation system (Stokoe, et al 1965). However, like the International Phonetic Alphabet that is used to transcribe spoken languages, the use of Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are being used to record and analyze signed languages (e.g. Boston University's SignStream http://www.bu.edu/asllrp/SignStream/ and SportsTec's StudioCode application

http://www.sportstecinternational.com/). A more widely used means of trying to record signs is "glossing" (e.g. Baker-Shenk & Cokely, 1980), in which an English word written in all capital letters is used to refer to a sign. Thus the gloss "CAT" refers to the sign that is used to represent the concept "cat". Glossing has some severe limitations however. Unlike Stokoe notation, the reader of a glossed transcription must already know the sign being referred to in order to approximate the articulation of the sign that was glossed. Also the same gloss may refer to two different variants of the same sign, since glossing does not capture articulatory behaviors. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when communicating with a TeleType Writer (the acronym TTY is used). TTYs began as retrofitted, discarded Western Union teletype machines, hence the acronym TTY. Newer devices are also referred to by the acronym TDD - Telecommunication Device for the Deaf. TTYs/TDDs make it possible for Deaf people to type to each other over existing phone lines; but TTYs/TDDs are now virtually obsolete because of the virtually ubiquitous presence of Videophones within the Deaf Community.

However, glossing is not a written form of American Sign Language, nor is it written English, even though the words may be English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving, signed, conversational interactions. Analog and digital video recordings and the use of Videophones (essentially internet signed communication using video web-cams) not only have rapidly replaced TTYs and the need for a written form of American Sign Language, but also have provided a more accurate means of preserving and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective

and primary means of communication. Likewise, they also are unable to rely upon means of communication that are based on or derived from speech and hearing, such as written English, as an effective and primary means of communication. For Deaf people, the use of American Sign Language is not simply a matter of convenience or preference. American Sign Language provides the only effective and efficient means of linguistic communication for members of the Deaf Community.

2.   ***Limitations Of English Within The American Deaf Community***

It is clear and undeniable that members of the American Deaf Community embrace and accept American Sign Language, and that its use is central to defining and understanding the Deaf Community. It is also clear that Deaf people exist as a linguistic minority within a society in which English is the dominant language. However, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as those for any second language learner, but other, more severe challenges exist for Deaf people. Nevertheless, one of the widely held misconceptions about Deaf people is that although they do sign, they can read and write English fluently. As with other misconceptions about Deaf people, this has no basis in fact or reality.

While it certainly is a desirable goal for Deaf individuals to be competent in both ASL and English, the reality is that for the vast majority of Deaf people, competence in English is rarely attained. Certainly the history of the education of Deaf students attests to the fact that, for the vast majority of Deaf people, acquiring competence in <u>spoken</u> English is virtually unattainable (among others, Marschark & Spencer, 2003; Wrigley, 1996; Lane, 1992). Also, the majority of Deaf people do not attain competence in <u>reading</u> and <u>writing</u> English because those forms of communication are derived from spoken English. According to Karchmer and Mitchell

12

(2003), study after study concludes with the same overriding concern: "…the average performance on tests of reading comprehension for deaf and hard of hearing students is roughly six grade equivalents lower than their hearing peers at age 15." (e.g. Allen, 1986; Traxler, 2000). The essential difficulty is that Deaf students are "…caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context." (deVillers and Pomerantz 1992). Thus, the commonly held misconception that Deaf people as a group can read and write English fluently is easily dismissed. The evidence is overwhelmingly clear – Deaf people, as a group, are not competent users of English.

Most Deaf people achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions, advertising posters and flyers and other basic printed material that is necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, Deaf people do subscribe to newspapers and magazines, although many seek out those portions of the publications supported by visual material (e.g. the comics page or advertising) or contain familiar arrays of numbers (e.g. the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to gain non-recurring or important information or to read most books or magazines.

Deaf people also communicate via e-mail and, in the past, TTY conversations, although

**13**

those communications often read like written (i.e. glossed) versions of what they would sign. Further, Deaf people write notes to people who are not deaf, although their notes are frequently misunderstood. Just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy. However, the critical point is that the average literacy level of members of the American Deaf Community is significantly lower than it is for the population as a whole.

According to the Gallaudet Research Institute, "For the 17-year-olds and the 18-year-olds in the deaf and hard of hearing student norming sample, the median Reading Comprehension subtest score corresponds to about a 4.0 grade level for hearing students. That means that half of the deaf and hard of hearing students at that age scored above the typical hearing student at the beginning of fourth grade, and half scored below." (http://gri.gallaudet.edu/Literacy/). Given this and given that literacy levels among the U.S. prison population are generally lower than those among the general population (Alaska Justice Forum 24(2): 2-4), one could reasonably conclude that the literacy levels among Deaf inmates would be lower than the non-deaf inmate population. In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf inmates would be considered functionally illiterate than would be the case for the inmate population as a whole.

The difficulties that a limited level of literacy presents for Deaf people are clearly non-trivial. Consider, for example, that when one personality test was given to Deaf people using elementary English and again using ASL, the results were so different that the investigators concluded it was like giving two different tests. (Lane, 1992). This author goes on to describe the

difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in
> English, they not only fail to understand test instructions
> thoroughly, invalidating the results, but also fail to understand the
> test content itself, as most tests are presented in written English,
> and in rather high-level English at that.
> One authority estimates that a tenth grade knowledge of English is
> needed to take most personality tests meaningfully. Yet only one
> deaf student in ten reads at eighth-grade level or better, and the
> average deaf student on leaving school has only a third grade
> command of English.

(Lane, 1992.)

Deaf people, like most immigrant populations in this country, attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This variety of English has been called "Deaf English" (Charrow, 1974; 1975), which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language.

It should be very clear that relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective means of communication.  It is the unquestionable ineffectiveness of speech, lip-reading and written English when communicating with Deaf people that makes the use of qualified sign language interpreters necessary for effective communication. The use of qualified sign language interpreters also is an important means of effective communication for those late-deafened deaf adults who have learned to sign.

3.    *Limitations Of Lip-Reading And Speech Within The American Deaf*
      *Community*

As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective and impractical for them to

15

communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word that makes possible repeated readings, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf people try to comprehend the fleeting spoken word as it appears on the speaker's lips.

The common misconception that most non-deaf people have is that all Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, the ability to hear, Deaf people's visual sense – and hence their ability to lip-read – becomes more acute in order to compensate. Most non-deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact, even someone who is fully fluent in and who has full auditory access to spoken English would struggle to lip-read English (non-deaf people have only to turn their television set to a Chinese or Russian language program and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this phrase, it could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is always even worse than their competence in written English.

One has only to look at oneself in a mirror and soundlessly mouth each of the following pairs of words to have a sense of the impossibility of lip-reading accurately. In each of these

**16**

pairs, one of the words is listed on the Frye list[4] of the one hundred most commonly occurring words in English.

> *to/you, in/thin, it/hit, he/she, on/don, are/car, with/width, his/is,*
> *i/eye, be/bee, or/ore, one/won, by/bye, but/butt, not/knot,*
> *your/door, an/ant, which/witch, do/due, their/there, out/shout,*
> *many/manny, then/ten, these/he's, so/sew, would/wood, like/lick,*
> *him/shim, time/thyme, two/too, more/moor, see/she, no/know,*
> *way/weigh, been/bin, oil/coil, day/say*

According to Bernstein and Auer (2003), "Estimates of the upper extremes for the accuracy of lip-reading words in sentences have been as low as 10-30% words correct." This is in keeping with earlier work (Liben, 1978) that also provides evidence that speech-readers understand only about one fourth of what is said in dyadic (one-to-one) conversations.

     Of course, there are a number of other uncontrollable factors beside the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of accuracy, such as a person's facial bone structure, facial musculature, facial hair, lighting, rate of speech, etc. (Bernstein and Auer, Jr. 2003). Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that lip-readers' comprehension is so limited.

     If speech-readers understand only approximately a quarter of what is said in dyadic (one-to-one) conversations, it should not be surprising that the level of comprehension in small and large group interactions is significantly less. One reason for this is simply physical distance – the further away one is from a speaker the more difficult it is to discern fine muscle movements of the mouth necessary to lip-read. Another reason is because small group interactions in which a

---

[4] The Frye list consists of the one hundred most common words used in English ranked in order of frequency.

majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, i.e. whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. Deaf people trying to lip-read in small group interactions must constantly determine who is talking by trying to determine who other group members are looking at. By the time the d/Deaf person has determined who is speaking, the d/Deaf person has already missed the first several seconds of what the speaker has to say. This also means that it is difficult for the d/Deaf person to track who will next claim the floor and is often unable to claim a turn him/herself. Large groups pose even greater problems for the lip-reader: problems such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone in the large group.

When interacting with deaf people who rely on lip-reading to interact in a given situation, one must exercise extra caution to ensure that the deaf person has actually understood the interaction. This is because deaf lip-readers will often nod their heads, which the non-deaf interlocutor takes as a sign of comprehension. However, this is no different than second language users who engage in the same behavior. For example, students who are just learning American Sign Language will often and regularly engage in this behavior when communicating with deaf people. They do this, and deaf people do this, not to deceive the other person, but rather to "save face." That is, they do not want the other person to think they are "stupid" or incompetent. Their reasoning is that if they actually interrupt the other person each time they do not understand, that is precisely the impression they will be creating. They would rather accept the consequences of not comprehending than create an impression of incompetence.

18

Ideally, someone interacting with a deaf person who is relying on lip-reading must be aware that head nodding may not always signal comprehension. Unfortunately, this is rarely the case. The result is that the two interlocutors leave the interaction with two different impressions of the interaction. The deaf person leaves with "comprehension gaps" while the non-deaf person leaves thinking that the deaf person has fully comprehended.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people in such settings.

Of course, even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves in intelligible spoken English that, unlike late-deafened adults, they cannot do. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training, most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-deaf people can. Simply put, Deaf people don't know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people has been described as guttural, animalistic, and unintelligible.

Clearly, Deaf people know that their speech is ineffective as a primary means of communication: they know that those unfamiliar with "Deaf speech" have great difficulty understanding their speech; they know not to trust their speech for important interactions; they

know that their speech sounds unnatural; and they know that non-deaf people react negatively when they do use their speech. Thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is unintelligible and therefore not an effective means of communication, or in many cases they simply cannot use their speech.

It is true that many late-deafened individuals can be rather skilled lip-readers in some very controlled conditions (although factors listed above will also negatively impact their lip-reading accuracy). This is because, unlike those with childhood onset deafness, they have adult competence in spoken English to assist in making educated guesses. Unfortunately, their higher degree of accuracy at lip-reading coupled with their quite intelligible speech often lead people who are not deaf to conclude that the late-deafened individual is only pretending to be deaf and thus no special communication accommodations are needed or warranted.

Late-deafened adults are very likely to have intelligible speech and, because of their proficiency in English, are able to lip-read with slightly better accuracy. As noted, this often leads people who are not deaf to assume that the late-deafened adult is "faking" their deafness. But, as noted above, late-deafened adults who retain reasonably intelligible speech present a false image to those who are not deaf. They "sound normal" and so the conflation of speech and hearing becomes significant ("if you speak that well, I assume you must be able to hear as well"). That audist stereotype often leads to late-deafened adults being misunderstood and discriminated against because they cannot successfully engage in "normal" communication. That is, while they can express their thoughts in intelligible English, given the severe limitations of lip-reading and their lack of hearing, they are unlikely to understand what is said to them in response to their ideas.

20

For d/Deaf people as a group, then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. It is certainly true that in some context-specific social interactions a variable combination of speech, lip-reading, written words and gestures may enable a rudimentary level of low stakes, social communication (e.g. "change the TV channel," "pass the salt," "lights out"). However a variable combination of speech, lip-reading, written words and gestures would definitely not ensure effective communication in what would be termed "high stakes" interactions. "High stakes" interactions are those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications have significant, and possibly severe, negative repercussions for the d/Deaf individual.

Any list of "high stakes" interactions would certainly have to include disciplinary and/or investigative proceedings, medical appointments, mental health appointments (both individual and group counseling sessions), psychological evaluations, any formal evaluation (e.g. behavioral, educational, occupational), education sessions (e.g. specific training sessions, general educational opportunities), religious activities, instructions concerning health and safety, and post-incarceration interactions. Post- incarceration interactions would clearly include mandated meetings with probation and parole officers and therapy, counseling and self-help meetings. What these "high stakes" interactions have in common is that discussions, suggestions, courses of action and reliable decisions simply cannot be considered valid unless one can ensure that any communication between parties was conducted in a manner that was accurately conveyed and understood. Given the unreliability of lip-reading, speech and written communication that exists for d/Deaf people, one simply cannot conclude that relying solely on one or more of those forms of communication can result in accurate and effective communication in "high stakes"

interactions.

The clear reality is that the only practical way for Deaf people and for many deaf people to participate effectively in these types of "high stakes" one-to-one interactions, and in any small or large group interaction, is to employ the services of a qualified sign language interpreter.

Because of the importance of qualified sign language interpreters in ensuring communicative access and participation in a wide range of interactions, the next section will examine several aspects of sign language interpretation and misconceptions about the nature of sign language interpreting.

**<u>Summary Of Opinions With Respect To Deaf People As A Linguistic Community:</u>**

- Those with little or no knowledge of d/Deaf people or American Sign Language make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication and their signed language.

- The most significant factor uniting members of the American Deaf Community is the use of American Sign Language.

- American Sign Language is neither a manual form nor a derivative form of English, and thus there is not a one-to-one correspondence between American Sign Language signs and English words.

- The grammatical and syntactic structure of American Sign Language is quite different from the grammatical and syntactic structure of English.

- There is no conventional written form of American Sign Language.

- As a group, Deaf people face severe challenges in acquiring competence in spoken or written English, and most Deaf people rarely attain competence in spoken or written English. Thus relying on written communication is not a reliable nor effective means

of communication for most Deaf people.

- The average literacy level of the American Deaf Community is significantly lower than it is for the population as a whole.

- Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or in any "high stakes" one-on-one setting (i.e. interactions related to health, safety, discipline, post-incarceration interactions and the like).

- The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

- Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often thought to be feigning deafness.

- The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and in all "high stakes" one-to-one interactions is to provide a qualified sign language interpreter.

D.    *Sign Language Interpretation: Misconceptions And Certifications*

Given the passage of federal laws beginning in the early 1970s, including the Rehabilitation Act of 1973, it is reasonably safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several misconceptions and naïve assumptions surrounding sign language interpreters.

The first is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in American Sign Language is a necessary, but not

23

sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages, and the literature is quite clear on this point. (e.g. Seleskovitch, 1978; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005).

Another common misconception held by those who are not Deaf is that American Sign Language is easy to learn and thus one can rather quickly become a qualified sign language interpreter. However, the fact is that learning American Sign Language is as challenging as learning any spoken language; in fact, given the modality differences, many non-deaf students find it more challenging to learn American Sign Language than to learn a spoken language. (Peterson, 1999).

Another misconception about sign language interpreting is that signs exist in a one-to-one relationship with English words; that is, for every word there is a sign that conveys that word. Were this true, it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the words one hears and, conversely, the spoken words for the signs one sees. However, anyone who has studied another language knows that the vocabularies of any two languages do not map in a one-to-one relationship; this is a cross-cultural and linguistic reality well supported by the literature.[5] Likewise, anyone who has studied American Sign Language knows that ASL and English do not map to each other in a one-to-one relationship, a realization also well supported by the literature.[6]

---

[5] e.g. Larson 1998; Lyons, 1977; 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997

[6] e.g. Stokoe, 1965; Cokely, 1992, 2001; McIntire (ed) 1986; Mindess, 1999

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not sufficient, prerequisite to qualify as an interpreter, it is helpful to have a clear understanding of what interpretation is. The following definition provides such a starting point:

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.
>
> (Cokely, 2001.)

This is a general definition of interpretation that applies to signed and spoken language interpretation, and one that is well supported in the literature. (e.g. Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005). This definition places in proper context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to determine and then express meaning and intention that is at the heart of interpretation.

The cognitive processes by which meaning and intention are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation; demands of which are such that interpretation has been called "…probably the most complex type of event yet produced in the evolution of the cosmos." (Richards, 1953). While some may say this is hyperbole, it is undeniable that interpretation is an extremely complex cognitive task. In the past four decades, various models of the cognitive process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of

interpreters (e.g. Moser-Mercer, 1978; Chernov, 1978; Cokely, 1984, 1992; González et al, 1991). Examining any of these models makes clear the fact that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters, national certification by the Registry of Interpreters for the Deaf evolved, in part, to differentiate between those who could sign and those who could interpret (Cokely, 2005).

Interpretation generally takes one of two forms – consecutive or simultaneous. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings and in some legal settings. In diplomatic situations, it may be used when delegates or diplomats deliver speeches. In consecutive interpretation, one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand that the interpretation will proceed consecutively. In one-to-one interactions, the logical pause points may, for instance, be the conclusion of one of the participant's turns (e.g. asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses. In simultaneous interpretation the interpretation is delivered in the same general time frame as the original. The term "simultaneous" interpretation is actually a misnomer. No interpretation is delivered perfectly synchronously with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original, that means that the interpreter must first comprehend the original message. To do so requires that the interpreter wait

26

to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer. Thus, there is always a small temporal discrepancy between the production of the original message and the production of its interpretation because interpreters must necessarily chunk information that is coming to them. This temporal difference is called lag time (or sometimes by the French term décalage).

For at least the last five decades, it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and reliable opportunities for participation. No other reasonable accommodation at the present time can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment and social service segments of American society to realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings. For example, the national outrage by the Deaf Community to the faux interpreter at the Manatee County Florida Emergency newscast just prior to Hurricane Irma and the growing national discussion about the importance of providing interpreting services during emergency situations are clear indications of the recognition of the importance of qualified and credentialed interpreters for effective communication for d/Deaf people. Additionally, there was international attention given to the failure to provide effective interpreting services because of the use of a faux interpreter at the funeral services for Nelson Mandela.

27

Late-deafened adults who have learned to sign also benefit from and rely upon the services of qualified sign language interpreters. Such individuals often rely upon the combination of the interpreter's signs and lip-reading the interpreter or the speaker in order to have effective and reliable communicative access, both in small or large group and one-on-one settings. This augmented communication is necessary given the fragmentary nature of lip-reading and the likely fragmentary comprehension of signs by someone who is late-deafened. These sources of information work together in a complementary fashion to ensure a greater level of comprehensibility than either one does alone. Moreover, when acquiring a second language, the norm is that one's comprehension of that language always outpaces one's production of that language (think of young children who can always understand more than they can express). Accordingly, late-deafened adults who learn sign language generally comprehend the signs of qualified sign language interpreters better than (and faster than) the adult can produce the signs themselves.  Thus, provision of competent interpreters is often necessary to provide communicative rights and access to someone who is late-deafened.

The national professional organization for qualified sign language interpreters in the United States is the Registry of Interpreters for the Deaf (http://www.rid.org). Founded in 1964, the Registry of Interpreters for the Deaf (RID) currently has over 14,000 members nationwide. In 1972, the RID implemented a national evaluation and certification system that would provide a ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by an expressed need to differentiate between those who could sign and those who could interpret (Cokely, 2005). For the past 45 years, the assessment procedures have been implemented, revised and monitored using acceptable psychometric procedures to ensure their validity and reliability (http://www.rid.org).

The Registry of Interpreters for the Deaf also certifies interpreters to work in legal settings. According to the RID's 2007 Standard Practice Paper on Legal Interpreting:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney-client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication.

(RID, 2007.)

National assessment and certification of interpreters is a significant factor in ensuring that an individual possesses the range of competences and capabilities needed to render effective interpretation. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary items), gender variation (men and women may use different vocabulary items and grammatical structures) and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country communicate with each other. The critical point is that naturally occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

American Sign Language, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation (e.g. Woodward, 1994; Lucas, 2001). This means, for example, that older Deaf people may sign slightly differently than younger Deaf people, Deaf people from

29

the North may sign slightly differently than Deaf people from the South, and Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not in any way preclude Deaf people from communicating with each other. Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

**Summary Of Opinions With Respect To Sign Language Interpretation:**

- Competence in American Sign Language and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.

- The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.

- For non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.

- Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

- Late-deafened adults who have learned to sign benefit from and rely upon the services of qualified sign language interpreters.

E.     ***d/Deaf And Hard Of Hearing LDPSC Probationers and Parolees***

30

Between June and August 2017, I reviewed a number of documents provided to me by counsel. In September 2017, I conducted video meetings with the named plaintiffs: Messrs. Levy, Casto and Hammond. During these interviews, I was able to identify difficulties that have arisen for them and other probationers and parolees due to a lack of effective communication. I also reviewed a number of documents related to the inmate "interpreter" program established by Sign Language Services International (SLSI) under the direction of Mr. Daniel Burch and have identified problems and difficulties with that program as proposed and implemented.

Based on my 49 years of experience, a review of documents provided to me and individual video meetings with the two plaintiffs named above, I believe there are several areas involving a lack of communicative rights and access for d/Deaf and hard of hearing probationers and parolees.

F.    ***Necessary Changes For LDPSC Regarding Treatment Of d/Deaf And Hard Of Hearing Probationers and Parolees***

As noted above, it is simply not possible to determine or infer effective means of communication solely on the basis of an audiological exam. In attempting to determine the communication needs of d/Deaf and hard of hearing probationers and parolees, it is most reasonable to believe that the probationers and parolees themselves should be consulted on what means of communication are effective for them. Ideally, this consultation would occur when the probationers and parolees initially entered the LDPSC system and would be instrumental in providing d/Deaf and hard of hearing inmates and probationers effective communicative access while in LDPSC prison facilities. The practice of not involving d/Deaf and hard of hearing probationers and parolees in identifying their own communication access needs creates and reinforces a pejorative and uninformed audist view that d/Deaf and hard of hearing probationers

31

and parolees do not know what constitutes effective communication for them.

As described below, I believe that LDPSC's current procedures fail to provide reliable effective communicative access for d/Deaf and hard of hearing probationers and parolees. I also believe that procedures that involve or have involved the use of inmate "interpreters" are seriously flawed and must be altered. LDPSC must develop and implement procedures that ensure that each d/Deaf and hard of hearing probationer and parolee is involved in any decisions about what constitutes effective communication for that specific parolee (again, ideally this would occur while they were an inmate in the LDPSC system). Once determined, the means of effective communication must be reflected and implemented in all LDPSC mandated post-release activities.

Based on my 49 years of experience, my video interview with two of the named plaintiffs, and my review of documents, it is clear that LDPSC has failed to take adequate steps to ensure that d/Deaf and hard of hearing probationers and parolees are being provided effective communication. Given the high stakes nature of interactions with probation and parole officers and participation in LDPSC-mandated activities, these failures have serious, negative consequences for the communicative rights and access needs of d/Deaf and hard of hearing probationers and parolees.

1.  **LDPSC parolee officer reliance upon written communication with d/Deaf And Hard Of Hearing probationers and parolees.**

There appears to be an assumption by LDPSC probation and parole officers that merely providing written material or exchanging written notes provides effective access for d/Deaf and hard of hearing probationers and parolees. I believe this erroneous assumption is based on lack of information and training about d/Deaf and hard of hearing people and probationers and parolees.

Based on my 49 years of experience, my video interviews with d/Deaf or hard of hearing LDPSC probationers and parolees, and my review of documents, I believe that LDPSC parole officer reliance upon written communication seriously disadvantages d/Deaf and hard of hearing probationers and parolees (relative to those probationers and parolees who are not d/Deaf and hard of hearing) especially those who have limited literacy skills. To the extent that there are not effective means of communication (as determined with probationer and parolee involvement), LDPSC seriously disadvantages d/Deaf and hard of hearing probationers and parolees who have limited literacy skills, and LDPSC cannot claim to provide effective communication for those probationers and parolees.

During my video interview with Mr. Levy, he reported that despite his repeated requests that an interpreter be provided for his interactions with his parole officer, with one exception, those requests have been denied. According to Mr. Levy, his parole officer required that communication in all other interactions be conducted through written notes. When Mr. Levy repeatedly requested copies of the notes, his requests were denied. Both Mr. Levy and Mr. Casto reported that they are required to attend LDPSC mandated classes, but the classes are not communicatively accessible to them and thus are ineffective because LDPSC refuses to provide interpreters. Physical presence at classes and meetings cannot be equated with meaningful engagement. Mr. Casto also reported that his parole officer only makes home visits when his wife is home and only communicates with her, never directly with him.

With limited exceptions noted below, Mr. Hammond reported that his parole officer insisted upon written notes at all meetings. He also reported that he did not always understand his parole officer's written notes. Mr. Levy also reported that he did not and does not always fully comprehend what his parole officer is trying to communicate through written notes,

33

especially when jargon and technical terms are used. However, he stated that he is unable in writing to adequately express to his parole officer his lack of comprehension. He has repeatedly requested to keep the notes exchanged with his parole officer given that these notes would provide some measure of direct evidence of lack of comprehension and miscommunication. However, all of his requests have been denied.

2.   *LDPSC failure to provide qualified interpreters for "high stakes" interactions involving d/Deaf and Hard of Hearing probationers and parolees.*

As noted above, qualified sign language interpreters are needed for various professionals and d/Deaf and hard of hearing people to communicate effectively in all "high stakes" such as probation and parole officer interactions with their LDPSC probationers and parolees and any LDPSC mandated parolee activities (e.g. counseling, therapy, self-help meetings). The fact is that LDPSC probation and parole officers, counselors and therapists need interpreters as much as the d/Deaf and hard of hearing probationers and parolees do. It is not simply one party in an interaction who needs interpretation services; interpreters are needed because the participants do not have a shared language and thus cannot communicate directly or effectively with each other. An interpreter is needed not because someone is d/Deaf or hard of hearing; an interpreter is needed because counselors, doctors, probation and parole officers, etc. do not know American Sign Language and because d/Deaf and hard of hearing inmates and probationers and parolees do not have reliable access to spoken English. LDPSC's failure to reliably provide qualified interpreters makes it clear that it does not view provision of interpreters as necessary for its probation and parole officers, counselors, therapists, etc. to do their jobs. Absent the provision of qualified interpreters, LDPSC cannot claim that its probation and parole officers, counselors, therapists, etc. are able to communicate effectively with d/Deaf and hard of hearing probationers

and parolees in group interactions and in "high stakes" one-on-one interactions. LDPSC's use of "inmate interpreters" (discussed in detail below) fails to provide qualified interpreters for interactions involving d/Deaf and hard of hearing probationers and parolees.

Here it is worth stressing that there is a difference between "social signers" (i.e. individuals who know how to sign and may, in some very limited and low risk situations be able to facilitate communication between d/Deaf and hard of hearing people and non-deaf people) and qualified, certified interpreters. The level of competence achieved by these "social signers" (and based on the documents I have reviewed, I would consider the majority of the inmates in Mr. Burch's program as "social signers") is clearly not the level of fluency required to interpret with accuracy, fidelity and fluidity, which are necessary for effective communication.

Without proper training, these "social signers" turned interpreters are likely to be unaware of the linguistic and structural differences between ASL and English. They also are likely to think that the goal of interpreting is nothing more than rendering a sign for each word they hear or vice versa, when the essence of interpretation lies in determining meaning and intent and, as discussed above, discarding the form (i.e. the words or signs) of the original message. Finally, these "social signers/faux interpreters" are likely to be unable to manage and control lag time in order to deal with more structurally dense or complex messages.

Another, perhaps more important issue that must be considered is that employee or inmate "social signers/faux interpreters" will often have an interest in the material that they are signing or speaking. Someone acting as an interpreter who has a vested interest in the outcome of an interaction (e.g. a disciplinary meeting) will be unable to maintain the level of neutrality and objectivity required to accurately communicate the interaction. In addition, there are potential

HIPAA[7] violations by involving someone in an interaction who is not bound by confidentiality. By contrast, certified interpreters provide a level of measured, objective neutrality in their work that signing co-workers or fellow inmates may be unable to do so. Like doctors and lawyers, certified interpreters are bound by a professional code of ethics and conduct and pledge to maintain confidentiality, neutrality, impartiality and objectivity in their work (http://www.rid.org/ethics/code/index.cfm); "social signers/faux interpreters" are bound by no such code of ethics or ethical code of conduct.

Mr. Hammond reported that his parole officer used only inmate "interpreters" and only at three of his office visits, and he reported extreme difficulty understanding the inmate "interpreters". When Mr. Hammond requested an interpreter who was not an inmate, he was told that it was too expensive and so he would not be provided an interpreter who was not an inmate.

Mr. Levy reported that an in-person "interpreter" was provided on only one occasion – his mandatory one hour pre-release session. The "interpreter" that was provided was an inmate "interpreter" from Mr. Burch's program. He reported that the "interpreter" signed very slowly and Mr. Levy believes that as a result he missed much crucial information during that mandatory session.

Mr. Casto reported that despite his repeated requests there has not been an interpreter for any of his interactions with his parole officer. Mr. Hammond also reported that other than the three times he was provided an inmate "interpreter" which he could not understand, all of his requests for an interpreter were denied.

---

[7] The HIPAA Privacy Rule establishes national standards to protect individuals' medical records and other personal health information and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically.

The reports of Messrs. Levy, Casto and Hammond directly contradict the statement in the Bordelon deposition (pg. 34) that "If there's something in length that they [probationers and parolees] don't understand, we use interpreters through DOC via teleconference."

Mr. Levy also reported that he was provided with a Video Remote Interpreting (VRI) interpreter for only one of his many meetings with his parole officer (as noted above communication in all other interactions was conducted through written notes). He believes that the VRI "interpreter" was also an inmate "interpreter" from Mr. Burch's program. The failure to provide interpreters for probation and parole officer office visits is confirmed in the Lee deposition (pg. 82) when he stated that if a d/Deaf and Hard of Hearing probationer or parolee needs an interpreter "…We have usually had them bring a family member or friend to come in and interpret for them.". Thus there is no evidence that LDPSC has provided properly qualified and credentialed interpreters for probationers and parolees for interactions with probation and parole officers.

Based on my review of documents provided to me, there is no evidence that LDPSC uses an external agency to provide VRI services. It appears that LDPSC and Mr. Burch had begun using those who completed Mr. Burch's program to provide VRI services (see Mr. Burch's deposition of April 5, 2017, pgs. 72 & 73). If LDPSC is relying upon or is planning to rely upon inmates who completed Mr. Burch's program to provide VRI services for probation and parole officers and probationers and parolees, this is highly problematic for several reasons:

1) The use of "inmate interpreters" contradicts LDPSC's 2012 regulation B-08-018 which states "…A departmental employee should not be allowed to interpret if his presence poses a conflict of interest or raises confidentiality and privacy concerns. On occasion, an offender may possess the skill level necessary to provide interpreting

37

services; however, the impartially [sic] concerns remain, and in many-if not most-situations, offender interpreters should not be used due to confidentiality, privacy and security reasons".

2) There is no evidence in any of the documents that I reviewed that those who completed the program are or were members of the Registry of Interpreters for the Deaf (RID). As such they are or were not formally bound to the RID's Code of Professional Conduct and its most critical tenant which binds members to maintain confidentiality. To the extent that they are or were privy to very personal information likely to arise in meetings with probation and parole officers, health care meetings, counseling, therapy and self-help programs, there is no guarantee that those who completed the program will not share that information with others or that that information will not be shared with those who wish to do harm to the probationers and parolees.

3) The use of the Educational Interpreters Performance Assessment (EIPA) was, as noted by Mr. Burch in his deposition of April 5, 2017 (pgs. 67 & 68), an inappropriate measure to assess the proficiency of those in the program. The EIPA clearly does not assess an individual's readiness to do community interpreting. In fact, a number of states and Interpreter Referral agencies prohibit those who only hold EIPA credentials from providing community interpreting services. If LDPSC is using individuals who completed the program and were assessed by the EIPA, those individuals do not possess the necessary qualifications or credentials to do community interpreting, including "high stakes" interactions (e.g. meetings with a parole officer or LDPSC mandated counseling, therapy or self-help programs).

4) Comparing the names of those enrolled in Mr. Burch's program with the RID database, I find no evidence that any of those who completed the program have been certified by RID.

5) There is no evidence in any of the documents that I reviewed that the program provided exposure to a sufficient range of d/Deaf people that would enable those in the program to experience firsthand the communication variation that exists within the Deaf Community. If true, this means that those who completed the program were not and are not prepared to work as effective interpreters in community settings.

6) The most troubling aspect of the inmate "interpreter" program and the use of those inmates in providing VRI services as described is Mr. Burch's clear conflict of interest and his vested interest that exists at several levels: first, given that Mr. Burch's company Sign Language Services International (SLSI) profited from creating and operating the LDPSC inmate program, it was and is in its and Mr. Burch's own self-interest to make it appear that the program was successful. There is little evidence in any of the documents that I reviewed that the program was successful. Second, one of the primary instructors in the program, Mr. Burch, stated in his deposition (April 5, 2017, pg. 73) that he alone would be the person responsible for ensuring the quality of services rendered by those completing his program. Again, it is in SLSI's and Mr. Burch's own self-interest to make it appear that quality services were being rendered. Third, there is no formal, objective grievance procedure. Instead, according to Mr. Burch in his deposition (April 5, 2017, pg. 73) "…if they [probationers and parolees being provided service by the LDPSC VRI program] have a concern they get to me." Thus, Mr. Burch asserts that he should be the sole

arbitrator of any complaints about the program he established and those who complete it.

As noted above, Messrs. Levy, Casto and Hammond reported that despite repeated requests that an interpreter be provided for interactions with their parole officer, with four exceptions those requests have been denied. This means that Messrs. Levy, Casto and Hammond and other probationers and parolees who have been denied requests for interpreters cannot fully or meaningfully participate in interactions that have potentially serious and negative consequences for them. It also means that probation and parole officers and those responsible for LDPSC mandated parolee activities (e.g. counselors, therapists) cannot reliably and with surety claim that they have effectively discharged their responsibilities.

I believe that in order to have meaningful and effective communication between LDPSC probation and parole officers and d/Deaf and hard of hearing probationers and parolees in all LDPSC mandated group interactions LDPSC must provide sign language interpretation by state or nationally credentialed sign language interpreters. Additionally, if interpretation services are provided using VRI, then LDPSC must contract with an external VRI agency that employs properly credentialed interpreters to provide such services.

## IV.    Conclusions With Respect To Treatment Of D/Deaf Or Hard Of Hearing Probationers and Parolees.

Direct communicative interaction:

- The fact that a d/Deaf or hard of hearing person uses his/her speech in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

40

- The fact that a d/Deaf or hard of hearing person is able to lip-read in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

Provision of interpreting services:

- LDPSC should not use any of the graduates of Mr. Burch's inmate "interpreter" program to provide "interpreting" services for d/Deaf and hard of hearing probationers and parolees (and for any d/Deaf and hard of hearing inmates in the LDPSC system).

- Provision of qualified sign language interpreter services is the only way to provide d/Deaf and hard of hearing probationers and parolees with an equivalent level of access and effective communication available to probationers and parolees who are not d/Deaf or hard of hearing.

- While an in-person properly credentialed interpreter is always preferable, VRI equipment in the offices of those probation and parole officers assigned to work with d/Deaf and hard of hearing probationers and parolees may provide effective communication in interactions for which no in-person interpreter is available only if a properly qualified and credentialed interpreter is providing interpreting services.

- VRI using properly qualified and credentialed interpreters should only be used in "last minute/emergency" situations in which an interpreter is needed. VRI should not be viewed as a replacement for physically present interpreters at regularly scheduled meeting with d/Deaf and hard of hearing probationers and parolees.

41

- VRI using properly qualified and credentialed interpreters may be the best way to provide d/Deaf and hard of hearing probationers and parolees with effective and equivalent access to "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" in unannounced home visits by a parole officer.

LDPSC policies and procedures:

- A review of all LDPSC policies and procedures, with appropriate modifications where warranted, is necessary to ensure that d/Deaf and hard of hearing probationers and parolees are not systematically disadvantaged relative to probationers and parolees who are no d/Deaf or hard of hearing.

## V.    <u>Summary</u>

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. Many people who are not deaf have stereotypical and audist misconceptions about Deaf people and American Sign Language. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is 30% at best. Those who are not deaf believe that Deaf people can read and write English fluently when in reality the average Deaf person reads at approximately a fourth grade reading level. Those who are not deaf fail to understand that in order for communication with d/Deaf inmates to be effective and efficient it must be visually clear and unambiguous.

For meaningful, high stakes interactions, communicative access for d/Deaf and hard of hearing probationers and parolees must be provided by employing the services of a qualified sign

language interpreter. In addition to physically present interpreters, technology has made it possible to use the services of Video Relay Services (VRS) or a Video Remote Interpreter (VRI), when it is impractical to have a physically present interpreter. VRI may provide the only meaningful way to ensure accurate and effective communication in "last minute" situations such as unscheduled home visits by probation and parole officers.

Based on my 49 years experience with the Deaf Community and my review of the record, I believe that LDPSC has denied d/Deaf and hard of hearing probationers and parolees access to effective communication. Based on my experience, I believe that d/Deaf and hard of hearing LDPSC probationers and parolees are the victims of audism.

I believe that LDPSC must regularly review all of its policies and procedures and revise them where necessary to ensure that d/Deaf and hard of hearing probationers and parolees are not systematically oppressed and discriminated against.

Lack of information about Deaf people, their language and their culture on the part of LDPSC probation and parole officers (and, by extension, LDPSC officials) appears to play a major role in their decisions to deny or restrict communicative access for d/Deaf and hard of hearing probationers and parolees. One way to address lack of information and ignorance about Deaf people, their language and their culture is to implement regular awareness-training programs for probation and parole officers and perhaps other LDPSC officials. Among other topics, these training programs should address the stereotypes and biases about d/Deaf and hard of hearing people discussed above (e.g. levels of literacy and lip-reading) and the need for visual access.

This opinion is based on the materials I have reviewed thus far and my video interviews with named plaintiffs. I reserve the right to supplement this Declaration should new material

43

become available to me.

**Dennis Cokely**

Digitally signed by Dennis Cokely
DN: cn=Dennis Cokely,
o=Northeastern University,
ou=ASL Program,
email=d.cokely@neu.edu, c=US
Date: 2017.10.03 22:38:15 -04'00'

**Dennis Cokely**

**Date:  October 3, 2017**

## VI.    REFERENCES

### Publications

1.    Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Inmates. Justice Center, University of Alaska Anchorage. (Summer 2007).

2.    Baker, Charlotte and Robbin Battison (eds.). 1980. Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe. Silver Spring, MD: National Association of the Deaf.

3.    Baker-Shenk, Charlotte and Dennis Cokely. 1980. American Sign Language: a Teacher's Resource text on Grammar and Culture. Washington, DC: Gallaudet University Press.

4.    Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

5.    Brown, C. M. (1988). Human-computer interface design guidelines. Norwood, NJ: Ablex Publishing.

6.    Charrow, Veda. 1974. Deaf English: An Investigation of the written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

7.    Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 pg.139-149.

8.    Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.

9.    Cokely Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds): Sign language Interpreting and Interpreter Education: Directions for Research and Practice. Oxford: Oxford University Press.

10.    Cokely, Dennis. 1992. Interpretation: A Sociolinguistic Mode of the Interpretation Process. Burtonsville, MD: Linstok Press

11.    Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." Journal of Interpretation: Millennial Edition 1-46.

12.    Costello, Elaine. 1995 Signing: How to Speak with Your Hands. New York, NY: Bantam Books

13.    Crystal, David. 1997. The Cambridge Encyclopedia of Language. Cambridge, UK: Cambridge University Press.

14.    deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." In J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

15.    Duranti, Alessandro.1977. Linguistic Anthropology. Cambridge, UK: Cambridge University Press.

16.    Federal Communications Commission. 2015. FCC 15-136. Second Report and Order and Third Further Notice of Prposed Rulemaking.

17.    Frishberg, Nancy. 1986. Interpreting: An Introduction. Silver Spring, MD: RID Publications.

18.    Gates, George and John Mills. 2005. "Presbycusis." The Lancet: 366(9491), 1111-1120

19.    González R.D., V.F. Vásquez and H. Mikkelson. 1991. Fundamentals of court Interpretation: Theory, Policy and Practice. Durham, NC: Academic Press.

20.    Hatim, Basil and Ian Mason. 1997. The Translator as Communicator. New York: Routledge.

21.    Jankowski, Katherine. 2002. Deaf Empowerment: Emergence, Struggle, and Rhetoric. Washington, DC: Gallaudet University Press.

22.    Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

23.    Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

24.    Klare, G.R. (1974). "Assessing readability." Reading Research Quarterly: 10(1), 62-102.

25.    Klare, George R. "Readability." Handbook of Reading Research. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

26.    Klima, Edward and Ursula Bellugi 1979. The Signs of Language. Cambridge, MA: Harvard University Press.

27.    Kruger, Justin and David Dunning. 1999. "Unskilled and unaware of it: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Sel-Assessments. Journal of Personality and Social Psychology. Volume 77 (6) 1121-1134

28.    Lane, Harlan. 1984. When the Mind Hears: A History of the Deaf. New York: Random House.

29.    Lane, Harlan. 1992. Mask of Benevolence: Disabling the Deaf Community. New York:

Knopf.

30. Lane, Harlan, Richard Pillard and Ulf Hedberg. 2011. The People of the Eye: Deaf Ethnicity and Ancestry. New York: Oxford University Press

31. Larson, Mildred. 1998. Meaning-Based Translation: a Guide to Cross-Cultural Equivalence. Lanham, MD: University Press of America.

32. Liben, Lynn. 1978. Deaf Children: Developmental Perspectives. New York: Academic Press.

33. Lucas, Ceil. 2001. The Sociolinguistics of the Deaf Community. Cambridge, UK. Cambridge University Press.

34. Lyons, John. 1977. Semantics. Cambridge, UK: Cambridge University Press.

35. Lyons, John. 1995. Linguistic Semantics: An Introduction. Cambridge, UK: Cambridge University Press.

36. Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. Deaf Studies, Language, and Education. New York: Oxford University Press.

37. McIntire, Marina (ed.). 1986. Interpreting: The Art of Cross-Cultural Mediation. Silver Spring, MD: RID Publications.

38. Mindess, Anna. 1999. Reading Between the Signs: Intercultural Communication for Sign Language Interpreters. Yarmouth, ME: Intercultural Press.

39. Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). Language Interpretation and Communication. New York: Plenum Press

40. Nickerson, Raymond. 1998. "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises." Review of General Psychology (Vol. 2, No. 2): 175-220.

41. Padden, Carol and Tom Humphries. 1989. Deaf in America: Voices from a Culture. Cambridge, MA: Harvard University Press.

42. Padden, Carol and Tom Humphries. 2005. Inside Deaf Culture. Cambridge, MA: Harvard University Press.

43. Peterson, Rico. 1999. The Perceptions of Deafness and Language Learning of Incoming ASL Students. Unpublished dissertation. University of California, Riverside.

44. Pöchhacker, Franz. 2004. Introducing Interpreting Studies. London: Routledge.

45. Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

46. Richards, I. 1953. "Towards a Theory of translating" American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75): 247-262.

47. Robinson, Douglas. 1997. Becoming a Translator. New York: Routledge.

48. Rutherford, Susan. 1992. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

49. Seleskovitch, Danica. 1978. Interpreting for International Conferences. Washington, DC: Pen and Booth.

50. Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) Understanding Deafness Socially. Springfield, IL: Charles C. Thomas,

51. Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation. Journal of Interpretation: Millennial Edition 69-84.

52. Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. Sign Language Interpreting: Exploring Its Art and Science. Needham Heights, MA: Allyn Bacon.

53. Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. A Dictionary of American Sign Language on Linguistic Principles. Washington, DC: Gallaudet University Press.

54. Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. Linguistics of American Sign Language. Washington, DC: Gallaudet University Press.

55. Wadensjö, Cecilia. 1998. Interpreting as Interaction. New York. Addison Wesley Longman.

56. Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

57. Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." Sign Language Studies 1:1-7.

58. Woodward, James. 1978. "Historical Bases of American Sign Language." In P. Siple (ed) Understanding Language Through Sign Language Research. New York: Academic Press.

59. Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

60. Wrigley, Owen. 1996. The Politics of Deafness. Washington, DC: Gallaudet University Press.

## **Websites**

1. **Video Analysis Software**

   - http://www.bu.edu/asllrp/SignStream/

   - http://www.sportstecinternational.com/

   - National Consortium of Interpreter Education Centers

   - http://www.interpretereducation.org/wp-

     content/uploads/2013/02/Practitioner_FINAL_REPORT_021513.pdf

2. **Registry of Interpreters for the Deaf**

   - http://www.rid.org

3. **Americans with Disabilities Act Technical Assistance Manual**

   - http://www.ada.gov/taman3.htm

4. **HIPPA Privacy Rule**

   - https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

**Appendix A**

**Dennis Cokely CV**


Dennis Cokely

78 Potter Pond
Lexington, MA 02421
Cell: (781) 710-2065
Office: (617) 373-3064
Fax: (617) 373-3065
Email: d.cokely@neu.edu
SS#: 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

**Education:**
Ph.D. 1984, Georgetown University, Washington, DC.
    Major: Sociolinguistics
    Minors: Applied Linguistics & Sociolinguistics and Sign Language
    Dissertation (with distinction): Towards a Sociolinguistic Model of the Interpretation
        Process: Focus on ASL and English.
M.A. 1976, American University, Washington, DC.
    Major: Applied Linguistics
B.A. 1968, St. Mary's University, Baltimore, Maryland
    Major: Philosophy
    Minor: Classical Languages

**Professional Experience:**
Full Professor, American Sign Language Program, Northeastern University
    2007 – present
Director, American Sign Language Program, Northeastern University
    1996 – present
Director, World Languages Center, Northeastern University
    2006 – 2016
Chair, Department of Languages, Literatures and Cultures, Northeastern University
    1998 – 2015
Associate Professor, American Sign Language Program, Northeastern University
    1996 – 2007
President, Sign Media, Inc. Burtonsville, Maryland,
    1980 - 1998
Director, Sign Languages International, Newark, England
    1993 - 1998
Adjunct Professor, Madonna University, Sign Language Studies Department
    1990 - 2005
Project Director, Interpreter Education Curriculum Development Project
    University of New Brunswick, Fredericton, Canada,
    1985 - 1986

50

Adjunct Professor, Western Maryland College (Graduate programs: Teaching ASL Program &
      Teaching Interpretation Program), Westminster, MD
      1987 - 1993
Instructor & Assistant Professor
      Gallaudet College, Graduate School, Washington, DC.
      1976 - 1984
Research Associate, Linguistics Research Lab
      Gallaudet Research Institute, Gallaudet College Washington, DC.
      1980 - 1984
Coordinator, Pre-College Manual Communication Programs
      Pre-College Programs, Gallaudet College Washington, DC.
      1977 - 1980
Sign Language Specialist, Kendall Demonstration Elementary School Gallaudet College
      1975 - 1977
Instructor, Kendall Demonstration Elementary School Gallaudet College
      1971 - 1975

**Print Publications:**

## Books and Monographs:

*Challenging Sign Language Teachers and Interpreters: The Reflector Revisited.* (ed) Burtonsville, MD: Linstok Press, 2007.

*Interpretation: A Sociolinguistic Model of the Interpretation Process*, Burtonsville, MD: Linstok Press, 1992. Significant portions have been translated and excerpted into Swedish and Japanese. The full text has also been translated into Italian and German.

  *Il processo di interpretazione: un modello sociolinguistico*: Edizioni Kappa. 2002. In cooperation with the Mason Perkins Deafness Fund (Italian Translation of *Interpretation: A Sociolinguistic Model*; "This is the first book on [sign language] interpretation ever published in Italy and is an essential text for interpreter training courses").

  *Gebärdensprach-Dolmetschen. Ein soziolinguistisches Modell.* (Internationale Arbeiten zur Gebärdensprache und Kommunikation Gehörloser; 28) Hamburg: Signum Verlag 1995.

*Sign Language Interpreters and Interpreting*, (ed) SLS Monograph Series, Burtonsville, MD: Linstok Press, 1992.

*New Brunswick Sign Language Interpreter Training Curriculum* (ed): University of New Brunswick. Fredericton, New Brunswick, 1988

*American Sign Language: a Teacher's Resource Text on Grammar and Culture* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Teacher's Resource Text on Curriculum, Methods, and Evaluation* (with C. Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 1 - 9* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 10 - 18* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 19 - 2*7 (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1981; Washington, DC Gallaudet University Press, 1991.

*Pre-College Programs: Guidelines for Manual Communication*. Washington, DC: Gallaudet College, 1979.

*Instructor's Manual for Kendall Demonstration Elementary School Family Sign Program*. Washington DC: Gallaudet College. 1973

## Book Chapters:

The National Consortium of Interpreter Education Centers in the United States of America (with Winston). In J. Napier (ed.), *International Perspectives on Sign Language Interpreter Education*, Gallaudet University Press, 2009.

Never Our Language; Never Our Culture: the Importance of Deaf Community Connectedness for Interpreters. in Bidoli and Ochse (eds.) *English in International Deaf Communication*. Peter Lang *Linguistics Insights Series*. 2008

Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community. In: Marschark, Peterson, and Winston, (eds): *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press, 2005.

Curriculum Revision in the Twenty First Century. In Roy (ed.) *Advances in Teaching Sign Language Interpreters.* Washington, DC: Gallaudet University Press, 2005.

The Effects of Lag Time on Interpreter Errors. In Cokely (ed) *Sign Language Interpreters and Interpreting*, SLS Monograph Series, Linstok Press, 1992. (previously appeared in *Sign Language Studies* 15:53)

Assessing Student ASL Skills. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation*. Silver Spring, MD. RID Publications, 1980

Assessing Students in Interpreter Preparation Programs. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation*. Silver Spring, MD. RID Publications, 1980

Sign Language: Teaching, Interpreting, and Educational Policy. In Baker and Battison (eds) *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe*. Silver Spring, MD: National Association of the Deaf, 1980.

Sign language in the 20th century: a Chronology. In: Baker and Battison (eds): *Sign Language and the Deaf Community. Essays in Honor of William C. Stokoe*. Silver Spring: NAD, 1980.

Childrenese as Pidgin. (with R. Gawlik) In: Stokoe, William C. (ed): *Sign and Culture. A Reader for Students of American Sign Language*. Silver Spring, MD : Linstok Press, 1980. (previously published in *Sign Language Studies* 5, 1974)

**Refereed Articles:**

Interpreting in Teams: A Pilot Study on Requesting and Offering Support. (with J. Hawkins) *Journal of Interpretation*, Fall 2003.

Interpreting Culturally Rich Realities. *Journal of Interpretation,* Fall 2001.

Exploring Ethics: A Case for Revising the Code of Ethics. *Journal of Interpretation,* Fall 2000.

The Effectiveness of Three Means of Communication in the College Classroom. *Sign Language Studies*, 69, Winter, 1990. Translated into German (*Die Relative Effektivität Unterschiedlicher Kommunikationsmittel im College-Unterricht*. In: Das Zeichen 5: 17 (1991))

Sociolinguistics, Language Policy and Education. in: J. Van Cleve (ed): *Gallaudet Encyclopedia of Deaf People and Deafness.* Vol. 3. S-Z, Index. New York, NY: McGraw-Hill Book Company, Inc., 1987.

The Effects of Lag Time on Interpreter Errors. *Sign Language Studies* 15, Fall, 1986

Foreigner's Talk and Learner's Grammar. *The Reflector,* 1984.

Comment on Newell et al. *Sign Language Studies* 12: 41, 1983.

When is a Pidgin not a Pidgin? An Alternate Analysis of the ASL-English Contact Situation. *Sign Language Studie*s, 38, Spring, 1983.

Metanotative Qualities: How Accurately are They Conveyed by Interpreters? *The Reflector*, 5, Winter, 1983.

The Interpreted Medical Interview: It Loses Something in the Translation. *The Reflector*, 1982.

Sign Language Interpreters: A Demographic Survey. *Sign Language Studies*, 10, Fall, 1981.

Assessing Communication Skills. *Directions*, 1, No. 4, 1980.

Options II: Childrenese as Pidgin. (with R. Gawlik) *Sign Language Studies* 5 1974. (expanded version of an earlier piece in *The Deaf American*).

**Non-Refereed Articles:**

A response to "The Danger Within…" CIT News, July 2006

How it's (not) done! In: *Sign Language Studies 23:* 84, 1994.

Editor's Comments: Tri-cultural Awareness. *The Reflector*, 1984.

Editor's Comments: Cultures of Deaf People. *The Reflector*, 1983.

Editor's Comments: Functional Competence. *The Reflector*, 1983.

Editor's Comments: Fluency in ASL. *The Reflector*, 1983.

Editor's Comments: Style Levels. *The Reflector*, 1983.

Editor's Comments: Signs for Special Purposes. *The Reflector*, 1982

College Level Sign Language Programs: a Resource List. *The Reflector* 1981.

Editor's Comments: Terminology. *The Reflector,* 1981.

Editor's Comments: Assessing Interpretation. *The Reflector*, 1981.

Options II: Childrenese as Pidgin. (with R. Gawlik) In: *The Deaf American* 26, 1974

Options: A position paper of the relationship between Manual English and Sign. (with R. Gawlik) In: *The Deaf American* 25, 1973.

**National Consortium of Interpreter Education Centers grant-funded publications:**

Understanding the Challenges of Deaf Interpreters  (with T. Schafer), December, 2016

Understanding the Challenges of Heritage Interpreters (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters of Color (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters Working in the Video Medium (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters Working with Children in K-12 Settings (with T. Schafer), December, 2016

Preparing Interpreters for Tomorrow: Report on a Study of emerging Trends in Interpreting and Implications for Interpreter Education (with Cathy Cogen), January 2015

Interpreter Referral Agency Needs Assessment Final Report, October 2015

Interpreter Practitioner Needs Assessment Final Report, January 2013

Interpreter Practitioner Needs Assessment Trends Analysis Final Report (with E. Winston), May 2010

Recent Findings: Stakeholder Trends, (with E. Winston), May 2010

Recent Findings: Trends Across All Needs Assessments, (with E. Winston), May 2010

Interpreter Education Programs Assessment Trends Analysis Final Report (with E. Winston), March 2010

Vocational Rehabilitation Needs Assessment Final Report (with E. Winston), November 2009

Phase II Deaf Consumer Needs Assessment Final Report (with E. Winston), September 2009

Interpreter Referral Agency Needs Assessment Final Report (with E. Winston), October 2008

Phase I Deaf Consumer Needs Assessment, Final Report (with E. Winston), September 2008

Interpreter Education Programs Needs Assessment, Final Report (with E. Winston), July 2008

NCIEC Interpreter Practitioner Needs Assessment, Final Report (with E. Winston), September 2007

**Conference Proceedings:**

Multimedia Dictionary of American Sign Language (Wilcox, Scheibman, Wood, Cokely, and Stokoe co-authors) in *Proceedings of the first annual ACM Conference on Assistive Technologies*. New York, NY ACM Press, 1994.

A Diagnostic Approach to Assessing American Sign Language. In: Caccamise, Garretson, and Bellugi (eds): *Teaching American Sign Language as a Second Language. Proceedings of the Third National Symposium on Sign Language Research and Teaching.* Boston, MA October 26-30, 1980. Silver Spring: NAD, 1982.

Meeting the Communication Needs of Deaf Students and Their Families. In: Bulgarian Deaf Union (ed): *The Deaf People in Modern Society. Proceedings of the 8th World Congress of the World Federation of the Deaf.* Varna, 1981.

Videotape Techniques in Sign Language Teaching. In Stokoe (Ed.) *Proceedings of the 1977 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Program Considerations in a Bilingual ASL-English Approach to Education. In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching*. Silver Spring, MD: National Association of the Deaf, 1980.

Evaluating ASL Skills in Pre-College Programs. (with David Knight) In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Curriculum and Instruction: Evaluation. In Caccamise and Gustason (Eds.) *Manual/Simultaneous Communication Instructional Programs in the Educational Setting*. Washington, DC: Gallaudet College Press, 1979.

An Innovative Approach to Family Sign Language Instruction. In: *Proceedings of the Forty-Seventh Convention of American Instructors of the Deaf,* 1975.

## Video Publications:

### Program Creation, Development, Direction, and Post-Production:

For each of the following 130 programs or program segments, responsibilities included: program background research, program preparation, program content and format, script writing and sequencing, talent selection and direction, program continuity control, log camera master videos, prepare edit decision list, supervise on-line edit, approve final edit, and supervise voice-over session.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *Interpreter Practice Materials* | 33 | 1996 |
| *Edgar Allan Poe* | 3 | 1996 |
| *Sherlock Holmes* | 3 | 1996 |
| *High-Five! Fables and Fairy Tales* | 5 | 1994 |
| *When the Mind Hears* | 13 | 1993 |
| *Using Your TTY* | 1 | 1993 |
| *An Introduction to the Deaf Community* | 1 | 1992 |
| *Interpreting the Miranda Warnings* | 1 | 1992 |
| *ASL Across America* | 12 | 1992 |
| *Semantic Awareness Test Kit* | 7 | 1991 |
| *Fingerspelling Practice Tapes* | 4 | 1991 |
| *Sports Sign Series* | 4 | 1991 |
| *Sign Language Interpreters in the Public Schools* | 3 | 1990 |
| *Signs Around the World* | 9 | 1990 |
| *Colors Around the World* | 1 | 1990 |
| *Selected Signs Around the World* | 1 | 1990 |
| *Alphabets Around the World* | 1 | 1990 |
| *Four For You! Fables and Fairy Tales* | 5 | 1989 |
| *Interpreters on Interpreting* | 6 | 1989 |
| *ABC Stories* | 1 | 1988 |
| *The Parent Sign Series* | 10 | 1985 |
| *Interpreter Models Series* | 2 | 1985 |
| *American Sign Language videotapes* | 6 | 1980 |

## Direction, and Post-Production:

For each of the following 51 programs or program segments, responsibilities included: program format, talent selection and direction, continuity control, and approve final edit.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *American Freedom Speeches* | 2 | 1995 |
| *Interpreting in the American Legal System* | 12 | 1995 |
| *The Gospel of Luke: An ASL Translation* | 5 | 1995 |

| | | |
|---|---|---|
| *Live at SMI !!* | 7 | 1993 |
| *Working With a Sign Language Interpreter* | 1 | 1993 |
| *Deaf-Blind Communication & Community* | 2 | 1992 |
| *The Face of ASL* | 4 | 1991 |
| *To Your Health* | 2 | 1991 |
| *Poetry in Motion* | 3 | 1990 |
| *ASL Numbers: Developing Your Skills* | 3 | 1989 |
| *Overuse Syndrome* | 1 | 1989 |
| *The American Sign Language Phrase Book* | 3 | 1988 |
| *The Mystery of the Superintendent's House* | 1 | 1986 |
| *Introduction to American Deaf Culture* | 5 | 1985 |

**Published ASL-English Translations:**

Each of the following English translations was prepared for published videotapes. These translations of American Sign Language were used as scripts in the production of spoken translations that comprise the accompanying audio track. These translations are also available in printed form upon request. I am the sole translator of these materials.

| | |
|---|---|
| *Gilbert Eastman: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 1* |
| *Patrick Graybill: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 2* |
| *Eric Malzkuhn: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: My New Family* | *Four For You: Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: Shepherd and Symbol* | *Four For You: Fables and Fairy Tales, volume 5* |
| *When the Mind Hears: High Theater* | *Sports Sign Series: Basketball* |
| *When the Mind Hears: A Tale Based on Fact* | *Sports Sign Series: Baseball* |
| *When the Mind Hears: The Secret* | *Sports Sign Series: Volleyball* |
| *When the Mind Hears: Success and Failure* | *Sports Sign Series: Soccer* |
| *When the Mind Hears: Fortune and Misfortune* | *High Five! Fables and Fairy Tales, volume 1* |
| *When the Mind Hears: Spreading the Word* | *High Five! Fables and Fairy Tales, volume 2* |
| *When the Mind Hears: Concerning Women* | *High Five! Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: A Dangerous Incursion* | *High Five! Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: The Denial* | *High Five! Fables and Fairy Tales, volume 5* |
| *When the Mind Hears: The Incurable Deafness* | *Sherlock Holmes: Red-Headed League* |
| *Edgar Allen Poe: The Black Cat* | *Sherlock Holmes: The Blue Carbuncle* |
| *Edgar Allen Poe: Fall of the House of Usher* | *Sherlock Holmes: The Speckled Band* |
| *Edgar Allen Poe: The Pit and the Pendulum* | *The Preservation of Sign Language* |

**Published English-ASL Translations:**

Each of the following American Sign Language translations was prepared for *American Freedom Speeches*, a videotape/text instructional package published in 1994. These ASL translations of English texts were used in the production of the videotape portion of this package. Co-translated with Patrick Graybill.

*The Preamble to the Constitution*
*The Bill of Rights*
*Liberty or Death*, by Patrick Henry
*Inaugural Address*, by Thomas Jefferson
*Gettysburg Address*, by Abraham Lincoln
*On Woman's Suffrage*, by Susan B. Anthony

*Inaugural Address*, by Franklin D. Roosevelt
*Inaugural Address*, by John F. Kennedy
*I Have A Dream*, by Martin Luther King, Jr.
*Struggle for Justice*, by Cesar Chavez
*On Human Rights*, Jimmy Carter
*Vice-Presidential Acceptance Speech*, by Geraldine Ferraro

**Web Published articles:**

Sign Language Interpreters — Complicit in a Devil's Bargain? December, 2011 (http://www.streetleverage.com/2011/12/sign-language-interpreters-—-complicit-in-a-devils-bargain/)

Defenders of Certification: Sign Language Interpreters Question "Enhanced" RID NIC Test January 2012 (http://www.streetleverage.com/2012/05/defenders-of-certification-sign-language-interpreters-question-enhanced-rid-nic-test/)

Vanquished Native Voices — A Sign Language Interpreting Crisis? March 2012 (http://www.streetleverage.com/2012/01/vanquished-native-voices-—-a-sign-language-interpreting-crisis/)

Sign Language Interpreters Seek clarity to Defend RID NIC Certification May 2012 http://www.streetleverage.com/2012/07/sign-language-interpreters-seek-clarity-to-defend-rid-nic-certification/

Sign Language Interpreters Seek clarity to Defend RID NIC Certification May 2012 http://www.streetleverage.com/2012/07/sign-language-interpreters-seek-clarity-to-defend-rid-nic-certification/

**Grants:**

**Successful External Grants (total funding to date: $14,822,803; at Northeastern: $14,072,803)**

Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2017-2022 (grant award - $2,000,000)

Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2015-2016 (grant award - $600,000)

Co-Principal Investigator, Northeastern University ProjectGO Intensive Arab instruction 2015-2017, Defense Department (first year award - $293,803)

Co-Principal Investigator, Northeastern University ProjectGO Intensive Arab instruction 2012-2014, Defense Department (first year award - $268,000)

Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2011-2015 (grant award - $3,000,000)

Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2011-2015 (grant award - $1,500,000)

Co-Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2005-2010 (grant award - $3,000,000)

Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2005-2010 (grant award - $1,500,000)

Co-Principal Investigator, Teaching Interpreter Educators and Mentors Online, Department of Education, 2002-2005 (grant award - $700,000)

Key Personnel, Northeastern Interpreter Education Project, Department of Education, 2000-2005 (grant award – $675,000)

Key Personnel and Grant Administrator, NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993 (grant award – $750,0000)

**Successful Internal Grants:**

Instructional Development Fund grant, 2008, Northeastern's Provost's office (award - $7,660)

Teaching With Technology grant, 2002, Northeastern's Provost's office (award - $25,000)

**Selected Related Experience:**

President, Registry of Interpreters for the Deaf, 1983 - 1987

Member, Board of Directors, Registry of Interpreters for the Deaf 1978- 1980

Associate Editor, *Sign Language Studies* 1984-1996

English Editor NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993

Editor, *The Reflector, A Journal for Sign Language Teachers and Interpreters* 1981- 1985.

Coordinator of Interpreters for National and International Conferences

    Selected experiences: Coordinated Conferences include the NATO International Conference on Sign Language Research (Copenhagen, Denmark), Georgetown University Round Table on Languages and Linguistics (annually 1978 – 1985) the Third National Symposium on Sign Language Research and Teaching (Boston).

Evaluation/Certification Team Chair, Sign Instructors Guidance Network (S.I.G.N.), 1976 – 1986.

Professional Interpreter, 1971 – present

Member, Advisory Board, The Learning Center for the Deaf

**Selected Certification:**

Comprehensive Skills Certificate (CSC), Registry of Interpreters for the Deaf

Comprehensive Permanent Certification, American Sign Language Teachers Association (ASLTA/SIGN)

Teaching English as a Second/Foreign Language, American University

Lifetime Post-Secondary Teaching Certificate, state of California

**Selected Awards and Honors:**

2017 National Treasure Award, Street Leverage

    The third such award; the first awarded to a non-deaf person

2006 Northeastern University Nominee for the CASE Professor of the Year Award

    (Council for Advancement and Support of Education)

2005 Outstanding Interpreter Educator Award

    Massachusetts Registry of Interpreters for the Deaf

2002 Excellence in Teaching Award

    Northeastern University

2002 Northeastern University Nominee for the Robert Foster Cherry Award for Great Teaching

    Baylor University

2000 Advisor of the Year Award

    College of Arts and Sciences, Northeastern University

1993 President's Award of Excellence, Madonna University

    "For excellence in promoting the language and culture of the Deaf Community"

1987 The Mary Stotler Professional Development Award

    by Registry of Interpreters for the Deaf and the Conference of Interpreter Trainers

1983 The Virginia Hughes Award

    by the Sign Language Interpreters of California

        "for Outstanding Contributions to the Interpreting Profession"

**Expert Witness Cases, Reports and/or Testimony:**

On behalf of Levy, et al., 2017
   Levy et al. v Louisiana Department of Public Safety and Corrections
   Proskauer Rose LLP

On behalf of Briggs, et al., 2016
   Briggs et al. v Massachusetts Department of Corrections
   Prisoners' Legal Services

On behalf of Disability Rights Florida, 2016
   Disability Rights Florida v Florida Department of Corrections
   Disability Rights Florida

On behalf of McBride, et al., 2016
   McBride et al. v Michigan Department of Corrections
   **Covington & Burling, Attorneys**

   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of David Bryant, 2012 & 2015
   Bryant v Federal Bureau of Prisons
   Sullivan & Cromwell LLP, Attorneys
   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Adams, Knights, et al., 2014
   Adams, Knights, et al v Kentucky Department of Corrections
   Weil, Gotshal & Manges LLP, Attorneys

On behalf of Holmes, Baxter, et al. 2014
   Holmes, Baxter, et al. v Illinois Department of Corrections\
   Winston & Strawn, LLP, Attorneys
   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Messrs. Boyd and Heyer, 2013
   Boyd and Heyer v Federal Bureau of Prisons
   Arnold and Porter LLP, Attorneys
   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Larry Berke, 2012
   Berke v Federal Bureau of Prisons
   Ballard Spahr LLP, Attorneys
   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Minis, et al, 2010
   Minis, et al v Virginia Department of Corrections
   Winston & Strawn, LLP, Attorneys
   Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Deborah Gibson, 2008
   NIR vs Deborah Gibson
   William Pincus, Attorney

On behalf of Jeffery Beardsley and Colette Ward, 2006
   Beardsley and Ward vs City of North Las Vegas
   Marina Kolias and Dale Boam, Attorneys

On behalf of Hubbard et. al. 2006 - 2009
    Hubbard et al vs United States Postal Service
    **Covington & Burling, Attorneys**

    Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Stockdale et. al. 1999 - 2000
    Stockdale et al vs Dorsey Business School
    **Jeff Kojacar, Attorney**

On behalf of the DeCosta family 1998 - 1999
    DeCosta family vs Beth Israel/Deaconess hospital
    **Lin Beck, Attorney**

On behalf of the US Department of Justice and the state of Maine 1997 - 1999
    Janet DeVinney vs Maine Medical Center
    James Moore, US Department of Justice, Attorney

On behalf of John Doe, 1992 - 1993
    John Doe vs state of South Carolina
    John Claybrooke, Attorney

On behalf of Carl Dupree, 1991 - 1992
    Family of Carl Dupree vs Gallaudet University
    Sarah Blackridge, Attorney

**Seminar, and Workshop Presentations:**
Over a thousand invited international and domestic seminars, lectures and workshop presentations on a wide range of topics, including:

Theoretical Models of Interpretation, Theoretical Aspects of Interpretation, Interpretation, Evaluation and Testing, Diagnostic Assessment of Interpretation, Proficiency Assessment of Interpretation, Educational Preparation of Interpreters, Comparative Linguistics for Interpreters, Semantics of American Sign Language, Teaching American Sign Language, Sign Language Assessment and Evaluation, Bilingual Education, Developing Communication Policy, Linguistics of American Sign Language, Communication and Communication Systems, Language Development, Language Acquisition, Cross-Cultural Interaction, Culture and Language

Selected domestic institutions at which invited graduate and undergraduate seminars and workshops have been offered during the past fifteen years include:

University of Hawaii, California State University at Northridge, Community College of Philadelphia, Central Piedmont Community College, DeKalb Community College, Gallaudet University, Georgetown University, Johnson County Community College, LaGuardia Community College, Madonna University, National Technical Institute for the Deaf, New York University, Ohlone College, Rutgers University, Seattle Central Community College, Syracuse University, Towson State University, University of Alabama, University of California at Berkeley, University of California at San Diego, University of Delaware, University of Maryland, University of New Hampshire, University of New Mexico, University of Pennsylvania, University of Tennessee, Vista College, Western Maryland College, William Woods University.

Selected international institutions at which invited seminars and workshops have been offered during the past fifteen years include:

University of Perugia, (Italy), American University of Rome (Italy), University of Copenhagen (Denmark), Tokyo Christian University (Japan), Durham University (Great Britain), University of New Brunswick (Canada), University of Ottawa (Canada), Stockholm University (Sweden), Wolverhampton University (Great Britain), Central Lanceshire University (Great Britain), McGill University (Canada), Herriot-Watt University (Scotland).

## Recent Selected Invited International Conference Presentations:

Trends Report: aligning Interpreter Education & Tomorrow's Challenges (with Cathy Cogen) 2015 Conference of the Registry of Interpreters for the Deaf

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report. 2014 Region 1 Conference Registry of Interpreters for the Deaf.

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report (with Cathy Cogen). 2013 Conference of the Registry of Interpreters for the Deaf.

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part II. 2009 Conference of the Registry of Interpreters for the Deaf.

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report (with Betsy Winston). 2007 Conference of the Registry of Interpreters for the Deaf.

Discover Interpreting! Marketing Interpreting as a Career (with Cathy Cogen). 2007 Conference of the Registry of Interpreters for the Deaf.

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part I. 2007 Conference of the Registry of Interpreters for the Deaf.

Research Implications for Interpreting in Teams. Italian Interpreters Association, American University of Rome, January 2003.

Diagnostic Assessment of Sign Language Skills. Italian Sign Language Teachers Association Conference, Rome, January 2003.

A Rights-Based Approach to Ethics for Sign Language Interpreters. Keynote Address at the first International Supporting Deaf People Online Conference, Derbyshire, Great Britain, January 2001.

Culturally Rich Realities: Challenges for Interpreters. Keynote address, International Symposium on Sign Language Interpretation, Durham University, October 1998.

ASL: Syntactic Structure. Pan-Asian International Sign Language Symposium, Tokyo Christian University, April 1994.

Diagnostic Assessment of Interpretation, Swedish Conference on Interpretation, August 1993.

## Selected Recent Invited National and Regional Conference Presentations:

Understanding the Motives for Sign Language Documentation at Commemorating George Veditz and Georgetown Pioneers in 100 Years of Sign Language documentation, Georgetown University, November, 2013

The Importance of the Day Before keynote presentation at StreetLeverage-Live! Atlanta, GA April 2013

Deaf Community Health Quotient workshop presentation at StreetLeverage-Live! Atlanta, GA April 2013

Portfolios: A Place in Assessing Interpreter Competencies presented to the Legal Interpreters Member Section at the Registry of Interpreters for the Deaf conference, Atlanta, 2011

What's in Your Knapsack? Endnote presentation at the RID Region I Conference August 15, 2010.

Cars, Dogs and Cows: Getting Inside the Interpreter's Mind. Workshop presented to the Vermont Registry of Interpreters for the Deaf. May 16, 2009.

Ignoring our Past, Dooming Our Future? Workshop presented to the interpreting community of Hudson Valley, Newburgh, NY, April 26, 2009.

Culturally Rich Realities: Implications for Interpreters. Conferencia PRRID (Puerto Rico Registry of Interpreters for the Deaf Conference), August 4-5, 2006.

Curriculum Revision for Interpreter Education Programs. Conference of Interpreter Trainers, Gallaudet University, October 2004.

Exploring Ethical Decision-Making for Interpreters. Pennsylvania State Registry of Interpreters for the Deaf, Philadelphia, Pennsylvania, October 2002.

Portfolios and Mentoring. Nashua, New Hampshire. New England Mentorship Conference for Working Interpreters, September 2001.

A Systematic Approach to Diagnostic Assessment of Interpretation. Registry of Interpreters for the Deaf conference, Orlando Florida, August 2001.

**Reflections on The Linguistics Research Lab. The Study of Signed Languages: A Conference in Honor of William Stokoe, Gallaudet University, October 1999.**

Interpreting Culturally Rich Realities: Research Implications for Successful Interpretations. Registry of Interpreters for the Deaf, Boston, Massachusetts, July 1999.

## Northeastern University Teaching History 1996 – 2015

| Year | Term | Course | Title | Enrollment |
|------|------|--------|-------|-----------|
| 1996-97 | Fall | ASL 1520 | Interpreting Role & Ethics | 11 |
| | Winter | ASL 1250 | Linguistics of ASL | 8 |
| | Spring | ASL 1507 | ASL-English Interpreting 3 | 11 |
| | | ASL 1801 | Directed Study | 3 |
| 1997-98 | Fall | ASL 1211 | Deaf Culture | 7 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | Winter | ASL 1212 | Deaf History | 14 |
| | | ASL 1250 | Linguistics of ASL | 18 |
| 1998-99 | Fall | ASL 1220 | Deaf People in Society* | 76 |
| | | ASL 1505 | ASL-English Interpreting 1 | 15 |
| | | ASL 1520 | Interpreter Role & Ethics | 13 |
| | Winter | ASL 1801 | Directed Study | 4 |
| | | ASL 1810 | Special Topics in Interpreting* | 5 |
| | Spring | ASL 1220 | Deaf People in Society | 50 |
| | | ASL 1250 | Linguistics of ASL | 19 |
| | | ASL 1801 | Directed Study | 4 |
| 1999-00 | Fall | ASL 1001 | College Intro | 5 |
| | | ASL 1220 | Deaf People in Society | 70 |
| | | ASL 1505 | ASL-English Interpreting 1 | 12 |
| | | ASL 1508 | ASL-English Interpreting 4 | 12 |

| | | | | |
|---|---|---|---|---|
| | | ASL 1520 | Interpreter Role and Ethics | 12 |
| | | ASL 1801 | Directed Study | 1 |
| | Winter | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 21 |
| | | ASL 1220 | Deaf People in Society | 67 |
| | | ASL 1801 | Directed Study | 2 |
| 2000-01 | Fall | ASL 1220 | Deaf People in Society | 76 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | | ASL 1801 | Directed Study | 4 |
| | Winter | ASL 1212 | Deaf Culture | 27 |
| | | ASL 1801 | Directed Study | 3 |
| | | ASL 1810 | Practicum | 8 |
| | | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 11 |
| | | ASL 1801 | Directed Study | 2 |
| 2001-02 | Fall | ASL 1220 | Deaf People in Society | 79 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 11 |
| | | ASL 1520 | Interpreter Role & Ethics | 14 |
| | | ASL 1802 | Directed Study | 2 |
| | Winter | ASL 1212 | Deaf Culture | 30 |
| | | ASL 1801 | Directed Study | 1 |
| | Spring | ASL 1211 | Deaf History | 28 |
| | | ASL 1220 | Deaf People in Society | 78 |
| | | ASL 1801 | Directed Study | 2 |
| 2002-03 | Fall | ASL 1220 | Deaf People in Society | 73 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 9 |
| | | ASL 1801 | Directed Study | 3 |
| | Winter | ASL 1212 | Deaf Culture | 30 |
| | | ASL 1801 | Directed Study | 1 |
| | Spring | ASL 1211 | Deaf History | 28 |
| | | ASL 1220 | Deaf People in Society | 78 |
| | | ASL 1801 | Directed Study | 3 |
| 2003-04 | Fall | ASL 150 | Deaf People in Society | 80 |
| | | ASL 350 | Deaf History & Culture | 24 |
| | | ASL 510 | Interpreting Inquiry Texts* | 14 |
| | | ASL 650 | Ethical Decision-Making* | 10 |
| | | ASL 924 | Directed Study | 3 |
| | Spring | ASL 950 | Interpreting Practicum | 9 |
| | | ASL 924 | Directed Study | 9 |
| 2005-06 | Fall | ASL 150 | Deaf People in Society | 71 |
| | | ASL 100 | Introduction to College | 9 |
| | | ASL 510 | Interpreting Inquiry Texts | 3 |
| | | ASL 650 | Ethical Decision-Making | 15 |
| | | ASL 651 | Ethical Fieldwork | 15 |
| | Spring | ASL 950 | Interpreting Practicum | 14 |
| | | ASL 460 | ASL Linguistics | 19 |
| | | ASL 934 | Directed Study | 2 |
| 2006-07 | Fall | ASL 150 | Deaf People in Society | 69 |
| | | ASL 100 | Introduction to College | 6 |
| | | ASL 510 | Interpreting Inquiry Texts | 8 |
| | | ASL 650 | Ethical Decision-Making | 3 |
| | | ASL 651 | Ethical Fieldwork | 3 |
| | | ASL 960 | Research Capstone | 7 |
| | Spring | ASL 950 | Interpreting Practicum | 3 |
| | | ASL 934 | Directed Study | 5 |

**64**

| | | | | |
|---|---|---|---|---|
| 2007-08 | Fall | ASL 150 | Deaf People in Society | 61 |
| | | ASL 100 | Introduction to College | 5 |
| | | ASL 650 | Ethical Decision-Making | 14 |
| | | ASL 651 | Ethical Fieldwork | 14 |
| | | ASL 960 | Research Capstone | 16 |
| | Spring | ASL 950 | Interpreting Practicum | 13 |
| | | ASL 934 | Directed Study | 5 |
| 2008-09 | Fall | ASL 150 | Deaf People in Society | 55 |
| | | ASL 100 | Introduction to College | 5 |
| | | ASL 650 | Ethical Decision-Making | 14 |
| | | ASL 651 | Ethical Fieldwork | 14 |
| | | ASL 550 | Intro to Interpreting Profession | 15 |
| | | ASL 960 | Research Capstone | 18 |
| | Spring | ASL 950 | Interpreting Practicum | 13 |
| | | ASL 934 | Directed Study | 4 |
| 2009-10 | Fall | DEAF 1500 | Deaf People in Society | 45 |
| | | DEAF 2500 | Deaf History & Culture | 12 |
| | | INTP 4650 | Ethical Decision-Making | 12 |
| | | INTP 4651 | Ethical Fieldwork | 12 |
| | | INTP 3500 | Intro to Interpreting Profession | 12 |
| | | INTP 4940 | Research Capstone | 7 |
| | Spring | INTP 4995 | Interpreting Practicum | 11 |
| | | INTP 3550 | Research Capstone | 4 |
| | | DEAF 4992 | Directed Study | 3 |
| 2010-11 | Fall | DEAF 1500 | Deaf People in Society | 48 |
| | | DEAF 2500 | Deaf History & Culture | 16 |
| | | INTP 4650 | Ethical Decision-Making | 8 |
| | | INTP 4651 | Ethical Fieldwork | 8 |
| | | INTP 3500 | Intro to Interpreting Profession | 8 |
| | | INTP 4940 | Research Capstone | 4 |
| | Spring | ASL 950 | Interpreting Practicum | 11 |
| | | ASL 460 | Research Capstone | 7 |
| | | ASL 934 | Directed Study | 4 |
| 20011-12 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 12 |
| | | INTP 4650 | Ethical Decision-Making | 10 |
| | | INTP 4651 | Ethical Fieldwork | 10 |
| | | INTP 3500 | Intro to Interpreting Profession | 8 |
| | | INTP 4940 | Research Capstone | 3 |
| | Spring | INTP 4995 | Interpreting Practicum | 10 |
| | | INTP 3550 | Research Capstone | 7 |
| | | DEAF 4992 | Directed Study | 3 |
| 20012-13 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 14 |
| | | INTP 4650 | Ethical Decision-Making | 6 |
| | | INTP 4651 | Ethical Fieldwork | 6 |
| | | INTP 3500 | Intro to Interpreting Profession | 10 |
| | Spring | INTP 4995 | Interpreting Practicum | 5 |
| | | INTP 3550 | Research Capstone | 6 |
| 20013-14 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 20 |
| | | INTP 4650 | Ethical Decision-Making | 5 |
| | | INTP 4651 | Ethical Fieldwork | 5 |
| | | INTP 3500 | Intro to Interpreting Profession | 9 |
| | Spring | INTP 4995 | Interpreting Practicum | 6 |
| | | INTP 3550 | Research Capstone | 5 |
| 20014-15 | Fall | DEAF 1500 | Deaf People in Society | 27 |

| | | DEAF 2500 | Deaf History & Culture | 14 |
|---|---|---|---|---|
| | | INTP 4650 | Ethical Decision-Making | 7 |
| | | INTP 4651 | Ethical Fieldwork | 7 |
| | | INTP 3500 | Intro to Interpreting Profession | 8 |
| | Spring | INTP 4995 | Interpreting Practicum | 7 |
| | | INTP 3550 | Research Capstone | 8 |
| 20015-16 | Fall | DEAF 1500 | Deaf People in Society | 25 |
| | | DEAF 2500 | Deaf History & Culture | 13 |
| | | INTP 4650 | Ethical Decision-Making | 7 |
| | | INTP 4651 | Ethical Fieldwork | 7 |
| | | INTP 3500 | Intro to Interpreting Profession | 11 |
| | Spring | INTP 4995 | Interpreting Practicum | |
| | | INTP 3550 | Research Capstone | |
| 20016-17 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 20 |
| | | INTP 4650 | Ethical Decision-Making | 5 |
| | | INTP 4651 | Ethical Fieldwork | 5 |
| | | INTP 3500 | Intro to Interpreting Profession | 4 |

**Service:**

University:

Senate agenda Committee 2015 – 2016

Faculty Senate, 2012 – 2016

Chair, Faculty Handbook Revision Committee, 2010

Chair, College of Social Sciences and Humanities Re-Structuring Task Force, 2009

Chair, Council of Chairs Agenda Committee

Member, International Programs Advisory Committee

Chair, Ad Hoc Committee to review University Tenure Appeals, 2008

Chair, Faculty Development Committee, 2008

Director, World Languages Center, 2007 - present

Faculty Senate, 2005 – 2008

Committee on Community Harmony and Inclusion, 2007 - present

RSFD proposal review committee, 2006

University Retention Committee, 2003-06

Chair, Senate Enrollment and Admissions Policy Committee, 2003-04

Member, University Retention Committee, 2000-03

Faculty Advisor for ICNU (the Interpreting Club of Northeastern University)

Faculty Advisor for NUCALLS (Northeastern University Culture and Language Learning Society)

College:

Chair, Faculty Development Committee 2016

College Faculty Development Committee 2015 – 2016

Chair Tenure and Promotion Committee 2016

College Tenure and Promotion Committee 2015 – 2016

College of Arts and Sciences Council of Chairs Agenda Committee Chair, 2000-2010

College of Arts and Sciences Tenure and Promotion Committee Chair, 1999 - 2006

College Tenure and Promotion Committee member, 1998 -1999

Program:

Head Advisor, American Sign Language Program, 1996 – present

Experiential Education Advisor American Sign Language Program, 1996 – present

Community:

Advisory Board member, Horace Mann School for Deaf Students

Interpret for DEAF, Inc. Board meetings, *pro bono*, 2005 - present

Interpret weekly FAA AWOL meetings, *pro bono*, 2004 - 2006

Advisory Board member, PAH! Deaf Youth Theater, 1998 - 2001

Advisory Board member, Madonna University Sign Language Studies, 1983 – present

Administer annual ASL Festival, April 1997 – present

Administer annual ASL Poetry, Storytelling & Deaf Art Competition, April 1998 – present

Discipline

Reviewer for NSF -- dissertation and grants proposals

Reviewer for DoE grant proposals

Various Interpreter Education program structure and faculty reviews

Various Interpreter Education program curriculum reviews

Review of manuscripts

Review of tenure dossiers

**Membership in Professional Organizations:**

Registry of Interpreters for the Deaf (Lifetime Member)

Conference of Interpreter Trainers

Linguistics Society of America

American Council on the Teaching of Foreign Languages

 American Association of Applied Linguistics

Research Committee for Sociolinguistics

American Translators Association

**Appendix B**

**Documents Reviewed**

1.  4-5-17 – Levy – Burch

2.  Application to enroll in Sign Language Classes

3.  Burch CV

4.  Case Narrative – Hammond

5.  Complaint Levy, et al v Louisiana Department of Public Safety and Corrections

6.  Case 3: 16-CV-00542-JWD-EWD

7.  DOC Sign Language Proposal

8.  EIPA PT Results

9.  EIPA WT Results

10. Email from Burch to S. Griffin re Grades

11. Excerpts from Anderson Depo re VRI

12. Excerpts from Bordelon Depo re VRI

13. Excerpts from Lee Depo re VRI

14. LCIW Policy No. 1-01-007, august 31, 2009

15. LDPSC Department Regulation No. B-08-018, April, 2012

16. LDPSC Department Regulation No. B-08-018, June 10, 2009

17. LDPSC Directive No. 01.016, Sept. 5, 2011

18. LDPSC Policy No. SUP609, Oct. 2015

19. LDPSC Policy No. SUP610, Sept. 2014

20. LDPSC Regulation No. B-07-001

21.    Levy v. DOC Homework

22.    Main Prison Files – Draft

23.    Parole and Probationer Grievance Procedure, levy, Jan. 7, 2013

24.    PCC Policy and Procedure Memorandum Number 99-C

25.    Performance Evaluation by LSPSC  of SLSI – 6.26.12, Contract #687650

26.    Performance Evaluation by LSPSC  of SLSI – 6.30.11, Contract #691064

27.    Performance Evaluation by LSPSC  of SLSI – 7.29.13, Contract #713769

28.    PPT – Introducing the American Deaf Community

29.    PPT – Training for inmate interpreters

30.    Sign Assessment Metric

31.    Sign Interpreting Assessment Metric

32.    Student Reports – 2015

33.    Student Reports – 2016

34.    Student Reports – 2017

35.    Student Reports 2014