UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LAWRENCE LEVY, ET AL.

CIVIL ACTION

VERSUS

NO. 16-542-JWD-EWD

LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS
AND JAMES LEBLANC

RULING AND ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 55) filed

by Plaintiffs Lawrence Levy, Cedric Hammond, and Bradley Casto (collectively, the "plaintiffs").

Defendants Louisiana Department of Public Safety and Corrections ("LDPSC") and James

LeBlanc (collectively, the "defendants") oppose the motion. (Doc. 61). The plaintiffs have filed a

reply brief in support of their motion. (Doc. 64). On January 31, 2019, the Court heard oral

argument on the motion. (Docs. 86 & 90). After careful consideration of the parties' arguments,

the facts in the record, and the applicable law, and for the following reasons, the plaintiffs' motion

(Doc. 55) is denied.

## I. BACKGROUND

A. Facts

The following facts are undisputed in the record unless otherwise indicated. Plaintiffs

Lawrence Levy, Cedric Hammond, and Bradley Casto filed this lawsuit on August 16, 2016,

alleging systemic deficiencies in the provision of accommodations for hearing-impaired

probationers and parolees by LDPSC; its Secretary, Defendant James LeBlanc; and the LDPSC's

Division of Probation and Parole ("DPP"). (Doc. 1). Their complaint alleges that the defendants

have failed to provide certain accommodations for hearing-impaired offenders in violation of the

Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("RA"). (*Id.* at 1–2). Specifically, they allege that the defendants have failed to: provide access to qualified American Sign Language ("ASL") interpreters, inform them of probation or parole requirements, adequately communicate with the plaintiffs, and provide accommodations during required DPP programs. (*Id.* at 12–15). The plaintiffs are subject to the supervision of DPP either through parole (in the case of Levy and Hammond) or a sentence of probation (Casto). (*Id.* at 6–9). They are all hearing-impaired and claim that they are only able to communicate effectively through ASL. (Doc. 55-1 at 1; Doc. 55-2 at 1; Doc. 55-3 at 1).

DPP is a division of LDPSC which supervises individuals who have been sentenced to probation or who are on parole after release from prison. (Doc. 55-5 at 7–8; Doc. 55-11 at 2). DPP officers meet with probationers and parolees at their homes, workplaces, and on site at DPP offices. (Doc. 55-7 at 5 & 8). The officers are responsible for monitoring the offenders' compliance with the terms and conditions of their supervision. (Doc. 55-8 at 5). They also track their attendance at required DPP programs. (Doc. 55-7 at 7). A violation of the terms of one's supervision may result in an extension of the term of probation or parole and/or incarceration. (Doc. 55-5 at 19–20; Doc. 55-9 at 7–8).

1.  **LDPSC and DPP Regulations**

LDPSC has promulgated several regulations with respect to the provision of aids and services for hearing-impaired offenders under its supervision. (Doc. 55-5 at 24–27; Doc. 55-15; Doc. 55-16). LDPSC adopted the regulations after an investigation by the U.S. Department of Justice ("DOJ") into LDPSC's failure to provide the necessary services for hearing-impaired offenders. (Doc. 55-13). As a result of the investigation, DOJ and LDPSC formulated an

2

agreement in 2008 which included certain improvements to LDPSC's provision of aids and services to its hearing-impaired supervisees. (*Id.* at 1–6).

The resulting regulations define "effective communication" as communication with disabled persons that is "as effective as communication with others," which includes the furnishing of aids and services "where necessary to afford qualified individuals with disabilities an equal opportunity to participate in or benefit from the services, programs and activities of the Department." (Doc. 55-15 at 3). They also provide that LDPSC "shall provide qualified sign language or oral interpreters when necessary for effective communication with, or effective participation in, departmental programs and activities by employees, offenders and visitors who are deaf or hearing-impaired." (*Id.* at 7). A DPP policy applicable to probationers and parolees mandates that interpreters must be provided "as warranted, to ensure effective communication," which includes "the intake process, office visits and preliminary hearings conducted in the field," as well as required programs. (Doc. 55-16 at 3–4).

To determine whether a probationer or parolee is hearing-impaired and needs an ASL interpreter, the regulations require DPP to conduct an "initial communication assessment" within 48 hours of the intake interview. (Doc. 55-15 at 5–6). DPP staff must also provide the offender with a "Request for Accommodation" form and perform a follow-up assessment within 10 weeks of the initial assessment. (*Id.* at 6). The policy then requires yearly assessments. (*Id.*). "[P]rior to explaining the conditions of probation or parole," DPP staff must determine "how best the offender communicates," such as through sign language. (Doc. 55-16 at 4). If a probationer or parolee is determined to be hearing-impaired, staff must use an appropriate aid or service to ensure effective communication. (*Id.*). The regulations discourage the use of inmates to interpret in "many—if not

3

most—situations," even though they "may possess the skill level necessary to provide interpreting services," due to impartiality, "confidentiality, privacy and security reasons." (Doc. 55-15 at 4).

## 2. Provision of Accommodations

Currently, LDPSC and DPP do not perform a communication assessment to determine whether a probationer or parolee is hearing-impaired and needs an ASL interpreter, or at any time thereafter. (Doc. 90 at 29; *see also* Docs. 55-1 at 2, 55-2 at 2 & 55-3 at 2). Nor did they provide a "Request for Accommodation" form to the plaintiffs during the intake process. (Doc. 55-1 at 3; Doc. 55-2 at 2; Doc. 55-3 at 2). According to the plaintiffs, instead of providing qualified ASL interpreters during intake meetings, when the terms and conditions of parole or probation are explained to the offenders, LDPSC and DPP typically rely on family or friends of the offender to serve as interpreters.[1] (Doc. 55-5 at 9–10; Doc. 55-3 at 2). ASL interpreters are often not provided during meetings with probation officers and are never provided for "field visits"—trips by supervising officers to an offender's home or workplace. (Doc. 55-1 at 2; Doc. 55-2 at 3; Doc. 55-3 at 2; Doc. 55-7 at 9). In lieu of ASL interpreters, probation and parole officers often communicate with their supervisees through written notes, text messages, or speaking. (Doc. 55-1 at 2–3; Doc. 55-2 at 3–4; Doc. 55-3 at 2–3; Doc. 55-5 at 10–11; Doc. 55-7 at 16).

For sign language interpreting, LDPSC also employs inmates who participate in its "American Sign Language Interpreter Program" through Video Remote Interpreting ("VRI"), which records an off-premises interpreter by streaming video. (Doc. 55-1 at 2; Doc. 55-2 at 4–5; Doc. 55-5 at 13–14; Doc. 55-17 at 6). LDPSC policy requires the inmate interpreters to be approved by its ADA Coordinator, to pass the Registry of Interpreters for the Deaf, Inc. ("RID") National Interpreters Certification test, and to complete a 225-hour internship "under the direction

---

[1] There is a dispute in the record regarding whether third-party ASL interpreters are provided during intake interviews. The defendants assert that ASL interpreters are provided at intake interviews. (*See* Doc. 61 at 6 & Doc. 61-6 at 2).

of Sign Language Services International, Inc." (Doc. 55-17 at 6). Dr. Dennis Cokely, a professor of American Sign Language and Modern Languages and former two-term RID president, testified that there is "no evidence" that the inmate interpreters who participated in this program were members of or certified by RID. (Doc. 55-14 at 39). The inmate interpreters were therefore "not formally bound to the RID's Code of Professional Conduct and its most critical tenant which binds members to maintain confidentiality." (*Id.*). Inmate interpreters are occasionally employed for meetings with officers and required programs. (Doc. 55-5 at 12 & 28; Doc. 55-1 at 2 & 4; Doc. 55-2 at 4–5). In some instances, the plaintiffs have lodged complaints about the use of inmate interpreters and requested qualified interpreters, but LDPSC and DPP have not granted these requests. (Doc. 55-1 at 2 & 4; Doc. 55-2 at 5; Doc. 55-3 at 2). The plaintiffs have also taken issue with the use of VRI due to its poor quality and their difficulty seeing the screen. (Doc. 55-1 at 4; Doc. 55-2 at 4–5).

On October 15, 2014, Hammond met with his parole officer, who arrested him after examining his cell phone and concluding that he had committed a parole violation by viewing material prohibited by the terms of his parole. (Doc. 55-2 at 3). The officer provided Hammond with a form, which he signed but did not understand. (*Id.*). The form admitted the violation and waived any right to a hearing and legal counsel. (Docs. 55-26 & 55-2 at 3). The form also represented that Hammond agreed to a 10-day sentence of incarceration for the purported violation. (Docs. 55-26 & 55-2 at 3). Similarly, during field visits, Hammond and Levy's parole officer provided them with a form asking them to elect between use of an ASL interpreter during field visits or waiver of the right to an interpreter. (Doc. 55-1 at 3; Doc. 55-2 at 4). No interpreter was present to explain the forms. (Doc. 55-1 at 3; Doc. 55-2 at 4). Finally, at another meeting at a DPP office, Levy's officer informed him that he would face arrest if he attended a presentation

regarding deaf access to justice in prisons because the program was located within 1,000 feet of a park. (Doc. 55-24 at 5–6). The officer instructed Levy to bring his own interpreter, but none was present. (*Id.*).

### 3. Plaintiffs' Testimony

Levy is 53 years-old and lost all of the hearing in his right ear as a child. (Doc. 55-1 at 1). He has partial hearing loss in his left ear. (*Id.*). Because he can "read and speak very little English" and is "not good at writing," ASL is his primary method of communication. (*Id.*). He struggles "understanding things unless they are explained to [him] in ASL." (*Id.*). Levy has been supervised by both Sarah Bordelon and Jamie Oertel. (*Id.* at 2). Levy requested an ASL interpreter multiple times for his meetings with Bordelon by writing notes, but Bordelon would "ignore [his] request or not answer it," and one was never provided. (*Id.*). On one occasion at a meeting at Bordelon's office, interpretive services were provided through VRI, but Levy suspected the interpreter was an inmate. (*Id.*). "[S]ome of the signs were wrong" and Levy was forced to "keep asking the inmate interpreter to repeat things, but he would still miss things." (*Id.* at 2–3). This led to "misunderstandings" and prevented Levy from communicating "sensitive information." (*Id.* at 3). According to Levy, while Bordelon attempted to communicate through written notes, he did not "understand everything she was trying to tell [him]." (*Id.*). He requested an interpreter for home visits, but Bordelon explained "that there was no money to pay for one." (*Id.*). It was difficult for him to communicate with her by text message because his English is "poor." (*Id.* at 4).

Levy is required to attend monthly classes as a condition of his parole. (Doc. 55-1 at 4). According to Levy, when inmate interpreters were provided using VRI at required classes, their "sign language skills were not good" and it was "not easy to see the interpreter on the video." (*Id.* at 4). A qualified ASL interpreter was occasionally present at the classes, but not often. (*Id.*).

6

Without a qualified ASL interpreter, Levy "cannot effectively communicate at these classes and [does] not fully understand what is being taught." (*Id.*).

Hammond is 58 years-old and was born deaf. (Doc. 55-2 at 1). He is able to read "very basic English, but it is difficult" for him, and he cannot lipread. (*Id.*). During Hammond's meetings with Bordelon, no interpreter has ever been provided despite the fact that he has requested one. (*Id.* at 3). According to Hammond, Bordelon told him that "interpreters were too expensive." (*Id.*). Bordelon communicates with him through written notes, but has "not understood everything she has tried to tell [him]." (*Id.*). When Bordelon arrested Hammond for a purported parole violation during a home visit, she requested that he sign a form admitting the violation without providing an interpreter or informing him that he had the right to request one. (*Id.*). On June 8, 2015, Bordelon arrested Hammond during an office visit for testing positive for cocaine, again without an interpreter present. (*Id.* at 4). Bordelon attempted to communicate with Hammond through written notes and eventually provided an inmate interpreter through VRI after the arrest. (*Id.*). Hammond "did not understand the interpreter because his ASL skills were poor." (*Id.*).

Hammond is also required to take classes as a condition of his parole. (Doc. 55-2 at 4). Interpreter services are provided at the classes through VRI with inmate interpreters. (*Id.*). However, the "quality of the inmate interpreters is not good" and Hammond cannot "always understand what they are saying." (*Id.*). He has explained to Bordelon that he could not understand the inmate interpreter, that the VRI screen was "too small, and the connection was not good and made it difficult to understand the inmate interpreter." (*Id.* at 4–5).

Casto is 30 years-old and is completely deaf in his left ear. (Doc. 55-3 at 1). He lost 90 percent of the hearing in his right ear as a five-year-old child. (*Id.*). He can "only communicate effectively using ASL" and has "a very limited vocabulary and knowledge of verbal English."

(*Id.*). Casto is supervised by Corey Bennett. (*Id.* at 2). During his intake appointment, he requested an ASL interpreter but one was not provided. (*Id.*). His wife attempted to interpret but, as a result, he "only understood some of the terms of [his] probation." (*Id.*). Casto has requested a qualified interpreter for home and office meetings with Bennett, but one has never been provided. (*Id.*). Instead, he must "try to communicate through verbal English even though [his] hearing is extremely poor and [his] understanding of verbal English is very limited." (*Id.*). Casto is required to attend counseling classes twice per month as a condition of his probation, where no ASL interpreters are provided. (*Id.* at 3). Casto requested an interpreter from Bennett, who told him that he "had to find and pay for one [himself]." (*Id.*).

### 4.    Officers' Testimony

DPP officers Corey Bennett, Sarah Bordelon, and Jamie Oertel, and supervisor Daryl Anderson all testified by either deposition or declaration. Bennett stated that he and Casto "have no problem communicating," that Casto can understand him, and that there are "no communication problems whatsoever" between the two. (Doc. 61-7 at 1–2). Casto initially requested an interpreter at their first meeting, but no interpreter was provided because "after a couple of minutes [of] talking to [Casto], it became apparent that he did not need an interpreter." (*Id.*). DPP staff "discussed it with him and . . . he could hear us fine, we could hear him fine. We had no problems with communicating." (*Id.* at 3). According to Bennett, Casto's wife "does most of the talking" at their meetings. (*Id.* at 6).

Bordelon stated that she has "not had difficulty effectively communicating with either" Levy or Hammond "by written communication." (Doc. 61-3 at 1). She stated that neither Levy nor Hammond "has ever complained . . . either verbally or in writing that they did not understand

[her] communications with them."[2] (*Id.* at 1). When Bordelon arrested Hammond for "having a large volume of prohibited material on his cell phone," Hammond did not indicate that he did not understand what was occurring and never complained "that he did not understand the form [admitting the violation] or the result of signing it." (*Id.* at 2).

Oertel supervises Levy and stated that she communicates with him "through writing." (Doc. 61-4 at 1). Levy has "never suggested or complained . . . that he cannot read or write, or communicate to [Oertel] in writing, or understand [Oertel's] written communications." (*Id.* at 1). Levy has "never requested an interpreter" for any interactions with Oertel and has not discussed with Oertel any "difficulty with interpreters" at required classes. (*Id.*).

Anderson, who supervises parole and probation officers at DPP's Baton Rouge office and was himself an officer in the past, stated that he has "interacted frequently over several years with both Lawrence Levy and Cedric Hammond" and has "never had difficulty, nor . . . observed any agent have difficulty, effectively communicating with either Mr. Levy or Mr. Hammond by written communication." (Doc. 61-9 at 1). He explained that neither Levy nor Hammond has "ever complained to [Anderson] either verbally or in writing that they did not understand anything [Anderson] or any other agent communicated to them." (*Id.*).

5.    **Requested Relief**

The plaintiffs' complaint requests an order mandating: (1) the provision of qualified ASL interpreters at meetings with probation officers; (2) the provision of qualified ASL interpreters at all programs hearing-impaired probationers and parolees are required to attend as a condition of supervision; (3) that the LDPSC ensure that hearing-impaired probations are parolees are able to communicate effectively at all proceedings; (4) that DPP officers and officials receive training in

---

[2] While this is not directly disputed, Levy stated that he wrote notes to Bordelon "telling her [that he] needed an interpreter." (Doc. 55-1 at 2).

issues related to hearing-impaired offenders; (5) that the LDPSC hire an independent monitor with access to LDPSC facilities and records to monitor the defendants' compliance, and that the monitor issue annual reports to the defendants and counsel for the plaintiffs for at least five years. (Doc. 1 at 16–17). Additionally, the plaintiffs request an order: (1) enjoining the defendants from retaliating against the plaintiffs and other similarly situated individuals as a result of this lawsuit; (2) enjoining the defendants from further ADA and RA violations; and (3) declaring that the plaintiffs are the prevailing party and awarding attorneys' fees, court costs, expert witness costs, and litigation expenses pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b). (*Id.* at 17).

The case is not a class action, but the parties jointly stipulated that any relief afforded to the plaintiffs will also be afforded to any other hearing-impaired probationers and parolees under LDPSC supervision. (*See* Doc. 39).

B.    **Parties' Arguments**

The plaintiffs first argue that they have proven a violation under the RA and ADA by establishing that each plaintiff has a qualified disability, that they are denied access to services, programs, or activities for which the defendants are responsible, and that the denial of access is a result of the plaintiffs' disability. (Doc. 55-31 at 12–13). Specifically, because the plaintiffs are hearing-impaired and because the defendants have admitted that they do not provide access to qualified ASL interpreters, the plaintiffs "are entitled to a judgment that Defendants have violated and are violating the RA and ADA as a matter of law." (*Id.* at 13). According to the plaintiffs, even if they are able to communicate to some extent by other means, the defendants are still committing an ADA and RA violation by willfully failing to provide qualified ASL interpreters. (*Id.* at 16–17). Further, the use of inmates to interpret is "clearly inadequate" because they are not qualified ASL interpreters and cause impartiality and confidentiality concerns. (*Id.* at 17–18). And

the VRI technology utilized by the defendants is an insufficient replacement for in-person ASL interpretation. (*Id.* at 19).

In response, the defendants point to a host of facts they claim are disputed, precluding summary judgment. Citing to the testimony of probation and parole officers, the defendants first dispute the assertion that ASL is the plaintiffs' only means of effective communication. (Doc. 61 at 3). According to the defendants, Casto could communicate with his probation officer, Corey Bennett, and agreed that an interpreter was not necessary. (*Id.*). Similarly, parole officer Sarah Bordelon testified that she was able to communicate effectively with Hammond and Levy, and that neither ever complained that they could not understand her. (*Id.*). Jamie Oertel and Darryl Anderson also testified that there were no significant issues communicating with Levy and Hammond. (*Id.* at 3–4).

The defendants argue that ASL interpreters need not be RID-certified under Louisiana law, because the relevant statute permits use of an interpreter who "is able to accurately communicate with and convey information to and from the person who is deaf or hard of hearing" in the event an RID-certified interpreter certified is "not available."[3] (Doc. 61 at 5). They also argue that some offenders actually prefer inmate interpreters over third-party interpreters, and that the ADA only ensures an accommodation "which reasonably provides sufficient access to services." (*Id.* at 5–6). Nevertheless, according to the defendants, ASL interpreters are provided far more than the plaintiffs claim. (*Id.* at 6). The defendants also take significant issue with the assertion that ASL

---

[3] Both the plaintiffs and defendants cite to Louisiana Rev. Stat. 46:2362 as their guidepost for the meaning of "qualified" interpreter. That statute provides that a "qualified interpreter/transliterator" is "any person certified by the [RID], or in the event an interpreter/transliterator so certified is not available, one whose qualifications are such that he is able to accurately communicate with and convey information to and from the person who is deaf or hard of hearing." La. R.S. 46:2362. The statute does not define what it means for an interpreter to be "not available."

interpreters are required for field visits, arguing that such a requirement would cause "serious security concerns and administrative and financial burdens." (*Id.* at 7).

The next factual dispute, according to the defendants, concerns the plaintiffs' understanding of the terms and conditions of their probation or parole. (Doc. 61 at 7). There is no evidence in the record "other than plaintiffs' declarations to support the allegation that they do not fully understand the terms and conditions of their parole." (*Id.* at 7). According to the defendants, the plaintiffs are advised of the terms and conditions of probation or parole prior to their release, and the terms and conditions are explained at intake interviews where interpreters are provided. (*Id.*). And even to the extent the defendants have violated their own policies and regulations, the Court cannot "infer a violation of the ADA and/or RA" on this basis. (*Id.* at 8). Finally, the defendants conclude by arguing against the applicability of the plaintiffs' cited case law. (*Id.* at 8–10).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must "go beyond the pleadings" and submit competent evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

The Fifth Circuit has further explained:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## III. DISCUSSION

Both the ADA and the RA prohibit discrimination against qualified individuals with disabilities. *See Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011). To state a claim under either the RA or the ADA, the plaintiffs must demonstrate that: (1) they have a qualifying disability; (2) they are being denied the benefits of services, programs, or activities for which the defendants are responsible; and (3) that such denial is a result of their disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).[4] "[T]he ADA applies only to public entities, including private

---

[4] The same analysis applicable to ADA claims also applies to claims under Section 504 of the RA. *See, e.g.*, *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) ("The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."). "In fact, the ADA expressly provides that '[t]he remedies, procedures and rights' available under the RA are also accessible under the ADA." *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting 42 U.S.C. § 12133)).

employers, 42 U.S.C. § 12131(1), whereas the [RA] prohibits discrimination in federally-funded programs and activities, 29 U.S.C. § 794(a)."[5] *Kemp*, 610 F.3d at 234.

"Standing to seek injunctive relief requires plaintiffs to show that they suffer or will suffer an injury-in-fact, and therefore would benefit from the court's granting of such equitable relief." *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 183 (5th Cir. 2015). The plaintiffs must show that "they face a palpable present or future harm, not harm that is 'conjectural or hypothetical.'" *Id.* (quoting *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 n.23 (5th Cir. 1998)). "Past wrongs" do not by themselves "amount to that real and immediate threat of injury necessary to make out a case or controversy." *Armstrong*, 131 F.3d at 563 (internal quotation marks omitted). "Past wrongs can be considered, however, as evidence of an actual threat or repeated injury." *Perez*, 624 F. App'x at 183.

A.      **Qualifying Disability**

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). In addition, there must be "a record of such an impairment," or the individual must be "regarded as having such an impairment." *Id.* The RA has incorporated the ADA's definition of disability. *See* 29 U.S.C. § 705(20)(B). The ADA includes hearing and communicating as examples of major life activities. § 12102(2)(A). Thus, the determination of disability is a three-part test: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity. *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003).

As counsel for the defendants conceded during oral argument, the Court can easily conclude that all three plaintiffs here are disabled within the meaning of the ADA and RA. They

---

[5] "Public entity" also includes "any department, agency, special purpose district, or other instrumentality of a State," § 12131(1)(B), and the plaintiffs have demonstrated that LDPSC receives federal funds.

have all testified that they have hearing loss—a physical impairment—which substantially limits their ability to both hear and communicate, two major life activities. Levy lost all of the hearing in his right ear as a child and is limited in his ability to hear out of the left ear. (Doc. 55-1 at 1). He testified that he has significant difficulty reading and speaking English and has a "hard time understanding things unless they are explained" in sign language. (*Id.*). Hammond was born deaf and has difficulty reading English. (Doc. 55-2 at 1). He cannot lipread. (*Id.*). Casto was also born deaf in his left ear and lost 90 percent of the hearing in his right ear as a child. (Doc. 55-3 at 1). He can "only communicate effectively using ASL." (*Id.*). Thus, there is ample evidence in the record from which to conclude that the plaintiffs each have a qualifying disability.

**B.      Denial of Benefits of Services, Programs, or Activities Resulting from Plaintiffs' Disability**

The plaintiffs argue that the defendants have failed to provide reasonable accommodations to enable them to "obtain the same benefits and participate in the same programs that non-disabled probationers and parolees do." (Doc. 55-31 at 14–15). The plaintiffs assert that the defendants "generally do not provide qualified ASL interpreters" during meetings between the plaintiffs and their supervising officers or at required programs, and never during field visits. (*Id.* at 15). The defendants admitted that third-party ASL interpreters are either rarely or never provided for these activities, and that they instead rely on written notes and, occasionally, VRI technology to communicate. According to the plaintiffs, the defendants' failure to provide qualified ASL interpreters impairs their ability to comply with (and understand) the terms and conditions of their probation or parole.

It is well established that the denial of the benefits of services, programs, or activities to disabled people need not be intentional for a plaintiff seeking injunctive relief. *See, e.g., Alexander*

15

*v. Choate*, 469 U.S. 287, 295 (1985); *cf. Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (observing that through the ADA, Congress recognized that "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion"). Thus, it is axiomatic that the ADA and RA do not require a plaintiff to specifically request a certain accommodation in order to prevail on a claim of disability discrimination. Indeed, "[a] plain reading of the ADA evidences that Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Delano-Pyle*, 302 F.3d at 567. However, a "critical component" of a failure-to-accommodate claim is "proof that the disability and its consequential limitations were known by the entity providing public services." *Windham v. Harris Cnty. Tex.*, 875 F.3d 229, 236 (5th Cir. 2017) (internal quotation marks omitted). "Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced *as a result* of that disability." *Id.* (internal quotation marks omitted).

In this vain, the Court finds unavailing the defendants' argument that the plaintiffs have not necessarily requested ASL interpreters "at all interactions with Probation and Parole staff." (Doc. 61 at 4–5). As the plaintiffs are not required under the law to request an accommodation, whether or not they have done so as much as they claim is immaterial. *See, e.g., Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (concluding that the defendant's "insistence here that prison officials have no legal obligation to provide accommodations for disabled inmates unless the inmate specifically requests such aid . . . is untenable and cannot be countenanced"). Indeed, where courts require a request, the purpose "is merely to put the entity on notice that the person is disabled." *Id.* at 270 (gathering cases). In any event, Levy, Hammond, and Casto all stated that they requested interpreters at various points. (*See* Doc. 55-1 at 2 (Levy stating that he

requested an interpreter during meetings with Bordelon but that "[s]he would just ignore [the] request or not answer it"); Doc. 55-2 at 3 (Hammond stating that "[n]o interpreter has ever been made available to me at [his approximately five] office visits [with Bordelon] even though I have asked for one"); Doc. 55-3 at 2 (testimony of Casto that he requested an interpreter both at his intake meeting and for meetings with his supervising officer at the probation office and at home)).

The defendants are correct to point out, however, that the plaintiffs are not necessarily entitled to any accommodation they seek. Indeed, the ADA "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Lane*, 541 U.S. at 532. While the defendants are not required to put the plaintiffs on an equal footing with non-deaf individuals, they are required to afford hearing-impaired offenders "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as their hearing counterparts. *Alexander*, 469 U.S. at 305 (quoting 45 C.F.R. § 84.4(b)(2)). Nevertheless, the determination of what, exactly, is necessary to satisfy this standard is a material question of fact the Court is unable to resolve at the summary judgment stage.

The defendants additionally argue that inmate interpreters (in lieu of qualified third-party interpreters) can provide "sufficient access to services." (*Id.* at 5–6). They also contend that they do not provide third-party interpreters to join probation and parole officers on field visits because doing so would impose an undue risk of injury to interpreters. (Doc. 61 at 6–7). The Court will address each argument in turn.

First, it is undisputed that inmate interpreters are not qualified interpreters by LDPSC's own standards. (*See* Doc. 55-17 at 6 (stating that inmates must "pass the national Registry of Interpreters for the Deaf, Inc. National Interpreters Certification test (both written and performance

tests) and complete a 225 hour internship under the direction of Sign Language Services International, Inc." to offer interpretive services)); (Doc. 55-15 at 40 ("no evidence" that any of LDPSC's inmate interpreters are RID-certified)). An LDPSC policy states that even if an inmate possesses the skill to provide interpretive services, impartiality "concerns remain, and in many— if not most—situations, offender interpreters should not be used due to confidentiality, privacy and security reasons." (Doc. 55-12 at 4). Levy testified that inmate interpreting was insufficient. (*See* Doc. 55-1 at 2 ("The inmate's signing was okay but some of the signs were wrong. I had to keep asking the inmate interpreter to repeat things, but he would still miss things. There were misunderstandings. I did not want to communicate sensitive information in the presence of an inmate interpreter.")). Hammond testified that he could not understand his inmate interpreter after Bordelon arrested him for a parole violation. (*See* Doc. 55-2 at 4 ("I did not understand the interpreter because his ASL skills were poor. The inmate interpreter and Officer Bordelon just ended up talking back and forth; it didn't make sense to me.")).

But, crucially for the purposes of this motion, the fact that the defendants are not in compliance with their own regulations does not necessarily mean that, as a matter of law, they have violated the ADA and RA. And while the plaintiffs point to Louisiana law for its definition of "qualified interpreter," *see* La. R.S. 46.2362, this statute merely informs the question of what is required under the ADA and RA—it is not dispositive of it. Moreover, the statute itself allows for an interpreter "whose qualifications are such that he is able to accurately communicate with and convey information to and from the" hearing-impaired person if an RID-certified interpreter is "not available." La. R.S. 46:2362(5). Thus, even if the Court were to rely on this statute to the extent the defendants do, it necessitates the answer to two factual questions the Court is unable to resolve at the summary judgment stage.

Similarly, the defendants' undue-burden argument demonstrates that a judgment in favor of the plaintiffs at this stage of the proceedings is premature. Specifically, the defendants assert that requiring ASL interpreters on field visits would be unduly burdensome, citing unspecified "security concerns and administrative and financial burdens." (Doc. 61 at 6–7; *see also* Doc. 61-13 at 1). Notwithstanding the fact that the defendants have failed to demonstrate how, specifically, such a requirement would be overly burdensome, the Court notes that their argument is sharply undercut by the fact that LDPSC's own policy does not exempt field visits from the provision of third-party ASL interpreters. *See Pierce*, 128 F. Supp. 3d at 277 (holding that the defendant could not make an "undue burden" or "fundamental alteration" argument where its Department of Corrections took "the official position that ASL interpreters should be provided as a matter of policy"). However, the Court is unable cannot conclude that it is *per se* unreasonable for the defendants to determine that it is not safe to have interpreters join officers on field visits 100 percent of the time.

The Court also points out that the defendants cannot legitimately dispute the plaintiffs' own level of understanding of the terms and conditions of their probation or parole is disputed. Only the plaintiffs themselves are competent to testify regarding their own understanding of the terms and conditions of their probation or parole, and they have testified under penalty of perjury that their understanding was impaired because of their inability to effectively communicate. The defendants' reliance on the testimony of the plaintiffs' probation and parole officers is a red herring because the officers are not competent to testify as to the plaintiffs' ability to understand and communicate. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). At best, the officers can testify regarding *their own* ability to communicate with the plaintiffs—

not the plaintiffs' ability to communicate with and understand them. That they believed the plaintiffs understood them in meetings is not significantly probative of the plaintiffs' own ability to communicate effectively in English. Accordingly, the Court accepts the plaintiffs' assertions regarding their ability to communicate and understand the terms and conditions of supervision. *See, e.g., Durrenberger v. Texas Dep't of Crim. Justice*, 757 F. Supp. 2d 640, 652 (S.D. Tex. 2010) (noting that the defendant failed to provide "any evidence that . . . contradicts [the plaintiff's] declaration that his hearing impairment prevents him from communicating by telephone unless the telephone is equipped with an amplification device").

Nevertheless, despite the evidence demonstrating that the plaintiffs have difficulty communicating with their supervising officers and the defendants' accommodations fall short of even their own regulations, summary judgment is only appropriate if the evidence shows that "there is no genuine issue as to any material fact *and* that the moving party is entitled to a judgment as a matter of law." *Anderson*, 477 U.S. at 247 (emphasis added). The defendants have identified a number of facts in the record that, when viewing the evidence in the light most favorable to them, preclude the entry of summary judgment. Specifically, they have pointed out that ASL interpreters have been provided at *some* meetings with probation officers and required programs. And the defendants noted that, in some instances, the plaintiffs have declined their offer of an interpreter, which could suggest that, in those cases, the plaintiffs had "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as their nondisabled counterparts. *Alexander*, 469 U.S. at 305 (quoting 45 C.F.R. § 84.4(b)(2)).

While the defendants' efforts to genuinely dispute the plaintiffs' assertions of fact were often fruitless, the Court is unable to conclusively determine on the record before it that the plaintiffs are entitled to judgment as a matter of law. It remains to be seen, and demonstrated

during a trial, exactly what is required of the defendants to specifically comply with the provisions of the ADA and RA.[6] Indeed, the determination of the reasonableness of a particular accommodation is often described by courts as "highly fact-specific" requiring "a complex balancing of factors." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2nd Cir. 2016) (internal quotation marks omitted). Insofar as the defendants have made some attempt to accommodate hearing-impaired probationers and parolees, there is at least "sufficient evidence favoring [the defendants] for a [fact-finder] to return a verdict" in their favor when viewing the evidence in the light most favorable to them. *Anderson*, 477 U.S. at 249. Accordingly, the plaintiffs' motion must be denied.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** that the plaintiffs' Motion for Summary Judgment (Doc. 55) is **DENIED**.

Signed in Baton Rouge, Louisiana, on March 4, 2019.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[6] The Court raised this concern with counsel for the plaintiffs during the January 31, 2019 oral argument. Specifically, counsel acknowledged that "so long as the interpreter . . . possess[es] the requisite skill level and is free from impartiality and bias, that interpreter is then qualified to carry out those duties." (Doc. 90 at 8–9). Counsel agreed that while the lack of an RID-certified interpreter might "inform" the question of ADA compliance, it is not necessarily dispositive of that question. (Doc. 90 at 9).